PER CURIAM.
Nicholas Noelani D. Smith appeals his capital-murder convictions and sentences of death. Smith was convicted of murder made capital for intentionally killing Kevin Thompson during a kidnapping, see § 13A-5-40(a)(1), Ala. Code 1975, and for intentionally killing Kevin Thompson during a robbery, see § 13A-5-40(a)(2), Ala. Code 1975. The jury, by a vote of 11 to 1, recommended that Smith be sentenced to death. The Calhoun Circuit Court accepted the jury's recommendation and sentenced Smith to death.
Facts
On the night of April 20, 2011, Kevin Thompson was speaking on the telephone to Chris Wilkerson, his friend, when he heard someone at his front door. Thompson opened the door. Wilkerson heard Thompson say, " 'I didn't know you was bringing all these people with you.' " (R. 1157.) Then, the telephone call was disconnected. Wilkerson dialed Thompson's telephone number and Thompson answered. The telephone call was brief, with Thompson telling Wilkerson that he would call him right back. A few hours passed without Thompson returning the telephone call. Worried, Wilkerson telephoned Thompson repeatedly around midnight, but Thompson did not answer.
Thompson's absence from his position as a teacher at Wellborn Elementary School was noticed early the following morning. Wendy Burns, a fellow teacher, became concerned when she saw that Thompson's classroom was dark as students were arriving. As Assistant Principal Jeanna Chandler testified, it was "just so out of character for Mr. Thompson not to be there, not to call." (R. 631.) Multiple individuals attempted to contact Thompson by telephone to no avail. Deputy Brendan Harris of the Calhoun County Sheriff's Office, the school's resource officer, was dispatched to an address to conduct a welfare check. The address, though, led Deputy Harris to the residence of Thompson's mother and sister, Frances and Rena Curry. Deputy Harris was able to make contact with Rena Curry and expressed to her the concern the staff at the elementary school had regarding Thompson's absence.
Rena Curry telephoned her mother and then drove to Thompson's apartment. Two things stood out to Rena Curry upon her arrival. First, Thompson's vehicle, a silver Honda Civic, was not in the parking lot. Second, and more peculiar, was a single shoe, which she believed belonged to Thompson, lying in the parking lot. The front door to Thompson's apartment was unlocked, and Rena Curry did not notice anything amiss inside.
Frances Curry telephoned the Jacksonville Police Department and asked that an *1091 officer meet her at Thompson's apartment. An officer responded to Thompson's apartment and briefly investigated before leaving. In Frances Curry's opinion, law enforcement seemed unconcerned about Thompson's whereabouts.
Undeterred, Frances Curry continued her search for her son. Frances Curry telephoned Thompson's bank and learned that several withdrawals had been made from Thompson's account the previous night at various financial institutions. Frances Curry again contacted the Jacksonville Police Department to inform them of the account activity.
Officers obtained surveillance footage from the area credit unions and banks where withdrawals had been made that corresponded with the times of activity on Thompson's account. Video from the Jacksonville branch of the Farmers & Merchants Bank depicted a silver vehicle arriving at 10:19 p.m. A man wearing a baseball cap bearing a script "A" made multiple withdrawals from the bank's automatic-teller machine ("ATM"). In an apparent attempt to obscure his identity, the man held his left arm across his face; the attempt, though, made visible a distinct tattoo on the man's left hand. The video also appeared to depict a passenger in the front seat of the vehicle aiming a rifle toward the backseat of the vehicle. Photographs from the Jacksonville branch of the Ft. McClellan Credit Union depicted what appeared to be the same man make a withdrawal from the ATM at 10:26 p.m. Photographs from the Anniston branch of the Ft. McClellan Credit Union depicted a silver vehicle and a dark-colored sport-utility vehicle arrive at 12:13 a.m. on April 21. There, a man walked up to the ATM and made a withdrawal. Officers presented photographs generated from the surveillance footage to Frances Curry and Rena Curry to see if an identification could be made. Rena Curry was able to identify Tyrone Thompson. Rena Curry explained that Tyrone Thompson was a family acquaintance whom Thompson had known since the two were children. Thompson had recently made contact with Tyrone Thompson; after Tyrone Thompson's latest release from incarceration, Tyrone Thompson's mother had asked Thompson to provide guidance to her son.
Investigator Clint Parris of the Anniston Police Department located Tyrone Thompson, and he agreed to be interviewed. During an interview with Investigator Parris and Investigator Joseph Martin of the Jacksonville Police Department, Tyrone Thompson identified Smith as being involved with Thompson's disappearance.
Meanwhile, Cynthia Warf, who had been visiting her husband, Andrew Jones, at the hospital, returned to her residence to find multiple individuals in her husband's garage. Warf saw Jessica Foster, her daughter; Whitney Ledlow; Smith; and two other males, who were later identified as Blake Hamilton and Teddy Lee Smith, in the garage with a silver vehicle. Unbeknownst to Warf and Jones, the silver vehicle had been in the garage since early that morning. Smith had telephoned Ledlow at 3:00 a.m. that morning to ask Foster if he could park his friend's vehicle at Warf's house and Foster had agreed. When Smith met with Ledlow and Foster later that morning, Smith told them he needed someone to "chop" the vehicle. At Ledlow's request, Hamilton and Teddy Lee Smith agreed to take the vehicle apart for scrap.
Warf, assuming that the vehicle had been stolen, told the individuals to remove the vehicle from the garage and threatened to telephone law enforcement. As she walked back to her residence, the individuals fled; Ledlow, Foster, and Smith went in search of a trailer to remove the vehicle, which by this point was not operable. Warf *1092 telephoned her husband about the silver vehicle in his garage and he telephoned law enforcement. When officers arrived at the garage, it was apparent that the silver vehicle was in the process of being dismantled. Assistant Chief Bill Wineman of the Jacksonville Police Department testified that the silver vehicle was registered to Thompson.
Ledlow, Foster, and Smith planned to return to Warf's house, tow the vehicle away, and burn it. That plan was abandoned, though, because they saw a number of police vehicles as they neared Warf's house. Smith told Ledlow and Foster that they "were deeper in it than [they] thought," so they drove away. (R. 849.) Ledlow and Foster decided to travel to Carrollton, Georgia, to give themselves time to consider their next step. Ledlow stated that she did not know what Smith had done to Thompson and described Smith's behavior during the trip to Carrollton as "perfectly fine." (R. 853.) In Carrollton, Ledlow rented a motel room for the night. There, Smith admitted to Ledlow and Foster that he had been involved in a murder with Tyrone Thompson and Jovon Dwayne Gaston. Smith detailed for them the crime and generally described the location of Thompson's body. Ledlow testified that she was initially incredulous because Smith was so calm. The three then went to a Walmart retail store to purchase clothes and toiletries. Ledlow playfully struck Smith in the arm while at the store, and Smith responded, "[D]on't you know you don't punch a killer." (R. 857.)
The following day, Warf contacted Investigator Parris and informed him that Smith's black Ford Explorer sport-utility vehicle was parked in a parking lot near her house. She also told Investigator Parris that Foster, Ledlow, and Smith were likely traveling in a GMC Yukon sport-utility vehicle that belonged to her son. Meanwhile, Smith was making arrangements to enter a drug-rehabilitation program in Florida. Ledlow, Foster, and Smith left the motel in Carrollton and traveled to the airport in Atlanta. On the way, Ledlow saw a number of police vehicles following them. When she parked near the taxi terminal at the airport, officers swarmed their vehicle and took the three into custody.
A search of the Yukon yielded a camera, which Foster admitted was taken from Thompson's vehicle. Officers also found a black baseball cap with a script "A," which appeared to match the hat that was captured by the ATM surveillance footage. Ledlow also admitted to taking a ring from Thompson's vehicle, which she pawned for $200. Ledlow and Foster provided lengthy statements to officers following their arrest, and Ledlow consented to a search of her property. Officers recovered several items of evidentiary value on Ledlow's property. From an exterior trash can, officers recovered: a pair of Nike Air Jordan basketball shoes, which had dried mud and vegetation stuck on the soles and several reddish-brown stains on the uppers; cardboard packaging for duct tape; a nearly expended roll of gray duct tape; and a t-shirt wrapped around a serrated steak knife, which appeared to bear a mixture of dried blood and mud on the blade and handle. Inside Ledlow's house, officers recovered: a pair of COOGI brand denim jeans, which bore dried mud; and a pair of boxer shorts, which bore red stains. Subsequent DNA testing established that the bloodstains found on the jeans, knife, and basketball shoes were consistent with Thompson's DNA. Smith was listed as a potential contributor for DNA found inside the basketball shoes, and DNA on the inside of the jeans was consistent with Smith's DNA.
*1093 Officers obtained information that Thompson's body had been disposed of down an embankment near a set of guardrails on U.S. Highway 278. Based on that description, Investigator Seth Rochester of the Cherokee County Sheriff's Office was able to locate Thompson's body in the early morning hours of April 23. Thompson's wrists were bound with duct tape, and a subsequent analysis of the tape revealed that the tape was consistent with the tape found in Ledlow's trash can.
The injuries suffered by Thompson were substantial. Dr. Emily Ward, a state medical examiner with the Alabama Department of Forensic Sciences, performed the autopsy on Thompson's body. Dr. Ward noted a cut across the front of the neck, which was deep enough to compromise the windpipe and left jugular vein. This injury caused blood to aspirate into Thompson's lungs. Thompson suffered four haphazard stab wounds to left side of his chest-two pierced the heart and all four pierced the left lung. Dr. Ward stated that the orientation of the wounds suggested that Thompson's assailants were standing while Thompson was in a submissive position on the ground. Thompson sustained a contusion to the entire left side of his face, consistent with punching or kicking. In Dr. Ward's opinion, this injury was caused by a "tremendous" amount of force. (R. 753.) Thompson bore superficial abrasions on his extremities, which could have been caused by falling; bruises to his wrists, which were consistent with his wrists being bound by duct tape; and defensive wounds to his palms. Dr. Ward stated that, although the stab wounds and injury to the throat were severally fatal, Thompson's death was not quick because Thompson did not sustain arterial bleeding. In Dr. Ward's opinion, Thompson would have been aware of his injuries and would have experienced significant pain.
Shane Golden, a forensic scientist with the Alabama Department of Forensic Sciences, processed Smith's Explorer. Golden applied a luminol reagent, which reacts with iron in the hemoglobin of blood, to the interior of Smith's vehicle. The reagent revealed three areas of luminescence in the vehicle-the back of the rear seat, the rear driver's side door panel, and the armrest of front driver's side door. Subsequent DNA testing of blood swabs taken from Smith's Explorer revealed that the samples were consistent with Thompson's DNA.
Golden noted a smell of cleaners in the Explorer. That odor was explained by John Robinson, who owned a detail shop. Robinson identified Smith as having come to his detail shop on the morning of April 21. Smith's visit was memorable to Robinson because Smith wanted only the interior of his vehicle cleaned and because Smith emphasized that he wanted the cleaning to be thorough. Robinson testified that he saw red spatter on the carpet in the back seat and around the console.
Smith was extradited to Alabama on April 27. Upon his return he waived his Miranda [1] rights and provided a statement to Investigator Parris and Investigator Martin, which gave the officers a horrifying glimpse into Thompson's final hours. Smith's statement included several versions, each more incriminating than the last. Smith stated that Tyrone Thompson had telephoned him around 10:00 to 10:30 p.m. on April 20 to "go get some money" and drink some beer. (State's Exhibit 60.) Tyrone Thompson picked up Gaston and Smith, and then the three went to Thompson's apartment. Tyrone Thompson, Gaston, and Smith walked up to the front door. Thompson met the men at the front door and Tyrone Thompson took a telephone from Thompson and smashed it.
*1094 Thompson was then taken to his vehicle. Gaston retrieved his rifle and all four men entered Thompson's vehicle.[2] Smith drove Thompson's vehicle to a bank where he withdrew funds from Thompson's account. The men returned to Thompson's apartment, at which point Thompson was forced into the trunk of his vehicle. After picking up Smith's Explorer, the men took both vehicles to Tyrone Thompson's house, where they drank beer and discussed who would kill Thompson. Following an unsuccessful search for a chop shop in Coldwater, Alabama, the men traveled to Warf's house and then to a branch of the Ft. McClellan Credit Union. Thompson's debit card did not work at the credit union, so the men returned to Warf's house. After a brief trip to a Shell gasoline station to purchase duct tape, the men returned to Warf's house and used the tape to bind Thompson. Thompson, though, had broken some of his bindings and was screaming in the trunk, so he was moved to Smith's Explorer. The men traveled to Piedmont, Alabama, and found an isolated stretch of Highway 278. Thompson was escorted off the road. Tyrone Thompson handed Smith a knife and held Thompson's hands while Smith slit Thompson's throat. Thompson, who was crying and pleading for help at this point, was held down as a vehicle passed. Then Gaston took the knife from Smith and stabbed Thompson several times in the chest. Thompson was held down as another vehicle passed, and then was held up and again stabbed by Gaston. After pushing Thompson to the bottom of the embankment, Smith, Tyrone Thompson, and Gaston left the scene.
In his statement, Smith attempted to marginalize his role by suggesting that he unwittingly had become involved in Thompson's murder and that he had been a reluctant participant. This suggestion, however, was rebutted by other evidence offered at trial. For instance, Smith told Investigator Parris and Investigator Martin that he had become involved in the murder of Thompson when Tyrone Thompson telephoned him around 10:00 p.m. on the evening of April 20. However, Ledlow and Foster testified that Smith had telephoned them around 6:00 p.m. to 7:00 p.m. on April 20 to ask about the maximum amount that could be withdrawn from an ATM. In addition, it was Smith who was captured on security footage driving Thompson's vehicle, making withdrawals from Thompson's account, and purchasing the duct tape to bind Thompson, and it was Smith who arranged for Thompson's vehicle to be dismantled. Ledlow and Foster further testified to Smith's calmness following the murder and to Smith's apparent embracing of his role as a "killer." (R. 857.)
Standard of Review
This Court has explained:
" 'When evidence is presented ore tenus to the trial court, the court's findings of fact based on that evidence are presumed to be correct,' Ex parte Perkins, 646 So.2d 46, 47 (Ala. 1994) ; '[w]e indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence,' Bradley v. State, 494 So.2d 750, 761 (Ala. Crim. App. 1985), aff'd, 494 So.2d 772 (Ala. 1986) ; and we make ' "all the reasonable inferences and credibility choices supportive of the decision of the trial court." ' Kennedy v. State, 640 So.2d 22, 26 (Ala. Crim. App. 1993), quoting Bradley, 494 So.2d at 761."
State v. Hargett, 935 So.2d 1200, 1203 (Ala. Crim. App. 2005). A circuit court's *1095 "ruling on a question of law[, however,] carries no presumption of correctness, and this Court's review is de novo." Ex parte Graham, 702 So.2d 1215, 1221 (Ala. 1997). Thus, "[w]hen the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court's judgment." Ex parte Jackson, 886 So.2d 155, 159 (Ala. 2004).
Further, because Smith has been sentenced to death, this Court must search the record for plain error. Rule 45A, Ala. R. App. P., states:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
(Emphasis added.)
In Ex parte Brown, 11 So.3d 933 (Ala. 2008), the Alabama Supreme Court explained:
" ' "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's 'substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations.' " Ex parte Bryant, 951 So.2d 724, 727 (Ala. 2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala. Crim. App. 1998) ). In United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
" 'The Rule authorizes the Courts of Appeals to correct only "particularly egregious errors," United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings," United States v. Atkinson, 297 U.S. [157], at 160, 56 S.Ct. 391 [80 L.Ed. 555 (1936) ]. In other words, the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." United States v. Frady, 456 U.S. at 163, n.14, 102 S.Ct. 1584.'
"See also Ex parte Hodges, 856 So.2d 936, 947-48 (Ala. 2003) (recognizing that plain error exists only if failure to recognize the error would 'seriously affect the fairness or integrity of the judicial proceedings,' and that the plain-error doctrine is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result' (internal quotation marks omitted))."
11 So.3d at 938. "The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal." Hall v. State, 820 So.2d 113, 121 (Ala. Crim. App. 1999). Although Smith's failure to object at trial will not bar this Court from reviewing any issue, it will weigh against any claim of prejudice. See Dill v. State, 600 So.2d 343 (Ala. Crim. App. 1991).
I.
Smith argues that the circuit court erred in allowing the State to introduce victim-impact evidence during the guilt phase. Smith argues that the evidence lacked probative value and that it was intended only to inflame the jury. Smith cites testimony given by multiple witnesses as being improper victim-impact evidence. Thompson's mother, Frances Curry, was invited during direct examination to tell the jury about her son and his childhood. Frances Curry spoke of Thompson's love and their strong family and shared anecdotes about Thompson's saving money to buy her flowers and *1096 Thompson's transferring funds into her bank account when she needed financial assistance. Frances Curry also explained to the jury that Thompson had a strong work ethic, was well mannered, and was passionate about his work as a teacher. Thompson's coworkers described their maternal relationship with the young teacher and the close bond they all shared as educators. Chris Wilkerson, Thompson's friend, disclosed Thompson's intention to pursue his doctorate and Thompson's plans to take leave from work to attend Wilkerson's graduation. Rena Curry, Thompson's sister, told the jury that Thompson was murdered while she was in the midst of taking her final examinations and that as a result of his murder she did not receive passing grades. Smith also argues that the State increased the prejudice by improperly relying on victim-impact evidence in its opening and closing arguments during the guilt phase.
This issue was raised at trial outside the hearing of the jury. To the extent Smith objected on the grounds now raised on appeal, Smith has no adverse ruling for this Court to review because the objection was sustained.[3] Therefore, this issue will be reviewed for plain error only. See Guthrie v. State, 616 So.2d 914, 929 (Ala. Crim. App. 1993) (citing Maul v. State, 531 So.2d 35, 36 (Ala. Crim. App. 1987) ).
"The Alabama Supreme Court has held that victim-impact statements
" 'are admissible during the guilt phase of a criminal trial only if the statements are relevant to a material issue of the guilt phase. Testimony that has no probative value on any material question of fact or inquiry is inadmissible. See C. Gamble, McElroy's Alabama Evidence § 21.01 (4th ed. 1991), citing, inter alia, Fincher v. State, 58 Ala. 215 (1877) (a fact that is incapable of affording any reasonable inference in reference to a material fact or inquiry involved in the issue cannot be given in evidence). If the statements are not material and relevant, they are not admissible.'
" Ex parte Crymes, 630 So.2d 125, 126 (Ala. 1993).
" '[T]he introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law.' Ex parte Rieber, 663 So.2d 999, 1006 (Ala. 1995). The Court in Ex parte Rieber also said:
" 'However, in Ex parte Crymes, 630 So.2d 125 (Ala. 1993), a plurality of this Court held in a capital murder case in which the defendant was sentenced to life imprisonment without parole that a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.'
" 663 So.2d at 1005."
Woodward v. State, 123 So.3d 989, 1021 (Ala. Crim. App. 2011) (emphasis in original).
Some of the evidence cited by Smith as being inadmissible in the guilt *1097 phase was properly admitted by the circuit court. Specifically, the witnesses' descriptions of Thompson's kindness, conscientiousness, dedication to his students and work, and responsible nature was properly admitted to show why his friends and family were insistent that Thompson's disappearance be investigated in the face of hesitance on the part of law enforcement. It was Thompson's family that generated the first lead in the case by contacting Thompson's bank, and this evidence explained why Thompson's family took that action. In other words, the evidence explained to the jury the early stages of the investigation. The evidence was also relevant to explain Thompson's involvement with Tyrone Thompson. Specifically, the evidence helped to explain why Tyrone Thompson's mother had asked Thompson to provide guidance to her son.
Indeed, a portion of the evidence cited by Smith constituted improper victim-impact evidence. Namely, isolated portions of Wilkerson's and Rena Curry's testimony were not relevant to a material issue at trial. However, as the Alabama Supreme Court made in clear in Ex parte Rieber, 663 So.2d 999 (Ala. 1995), the admission of victim-impact evidence during the guilt phase is not a ground for reversal "if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant." Ex parte Rieber, 663 So.2d at 1005. See Scheuing v. State, 161 So.3d 245, 264-65 (Ala. Crim. App. 2013).
Here, the admission of the victim-impact evidence was undoubtedly harmless. Smith did not deny his involvement in Thompson's murder, which is unsurprising given the State's overwhelming evidence. In addition to ample physical evidence, the State was armed with a recorded statement by Smith that included his admission that he had cut Thompson's throat. Instead, Smith's strategy, which was revealed during guilt-phase opening statements, was directed toward the penalty phase and avoiding the imposition of the death penalty:
"There's a lot of things I'd like to tell you about Nick Smith, but I can't. That's not what this portion of the case is about.
"....
"In this case, I wish I could stand up here with a straight face and say Nicholas Smith had nothing to do with any of this. I wish I could tell you he wasn't with Tyrone Thompson and Jovon Gaston. ... It would be a lie, and it wouldn't be true, and I couldn't do it."
(R. 574-76.) Nor did Smith deny that Thompson's death was tragic. This aspect of Thompson's murder was acknowledged by Smith during guilt-phase opening statements: "This case is a tragedy. It's a tragedy because Kevin Thompson lost his life, and it's tragic because a family lost a loved one. There's no other way to describe it. There's no excuses, no justification, and absolutely no reason." (R. 574.)
When viewed in the light of the evidence of Smith's guilt and the defense strategy, this Court concludes that the victim-impact evidence " 'did not affect the outcome of the trial, that it did not prejudice [Smith's] substantial rights, and that it did not rise to the level of plain error.' " Scheuing, 161 So.3d at 265 (quoting Woodward v. State, 123 So.3d 989, 1021 (Ala. Crim. App. 2011) ). As such, this issue does not entitle Smith to any relief.
II.
Smith argues that the circuit court erred in failing to charge the jury on the lesser-included offenses of felony murder and manslaughter and in failing to charge the jury on intoxication. Smith asserts *1098 that there was "substantial, uncontested evidence" of his intoxication during the abduction, robbery, and murder of Thompson. (Smith's brief, at 26.) Consequently, he argues, he was entitled to the aforementioned jury instructions. Because Smith neither requested that the jury be instructed on lesser-included offenses or intoxication nor objected to the circuit court's jury instructions, this issue will be reviewed for plain error only.
"Voluntary intoxication and manslaughter as a lesser included offense of intentional murder are interrelated and often overlapping subjects. 'Voluntary drunkenness neither excuses nor palliates crime.' Ray v. State, 257 Ala. 418, 421, 59 So.2d 582, 584 (1952). 'However, drunkenness due to liquor or drugs may render [a] defendant incapable of forming or entertaining a specific intent or some particular mental element that is essential to the crime.' Commentary to Ala. Code 1975, § 13A-3-2. Where the defendant is charged with a crime requiring specific intent and there is evidence of intoxication, ' "drunkenness, as affecting the mental state and condition of the accused, becomes a proper subject to be considered by the jury in deciding the question of intent." ' Silvey v. State, 485 So.2d 790, 792 (Ala. Cr. App. 1986) (quoting Chatham v. State, 92 Ala. 47, 48, 9 So. 607 (1891) ). Consequently, when the crime charged is intentional murder ' "and there is evidence of intoxication, the trial judge should instruct the jury on the lesser included offense of manslaughter." ' McNeill v. State, 496 So.2d 108, 109 (Ala. Cr. App. 1986) (quoting Gray v. State, 482 So.2d 1318, 1319 (Ala. Cr. App. 1985) ).
"It is clear that '[a] defendant is entitled to a charge on a lesser included offense if there is any reasonable theory from the evidence that would support the position.' Ex parte Oliver, 518 So.2d 705, 706 (Ala. 1987). This is true regardless of 'however weak, insufficient, or doubtful in credibility' the evidence concerning that offense. Chavers v. State, 361 So.2d 1106, 1107 (Ala. 1978). When there is evidence that would support a charge on a lesser included offense, the defendant is entitled to the charge 'even where "the defendant denies the charge," Ex parte Pruitt, 457 So.2d 456, 457 (Ala. 1984), and [where] "the evidence supporting the defendant's position is offered by the State." Silvey v. State, 485 So.2d 790, 792 (Ala. Cr. App. 1986). Accord, Ex parte Stork, 475 So.2d 623, 624 (Ala. 1985).' Starks v. State, 594 So.2d 187, 195 (Ala. Cr. App. 1991).
"A charge on intoxication should be given if ' "there is an evidentiary foundation in the record sufficient for the jury to entertain a reasonable doubt" ' on the element of intent. Coon v. State, 494 So.2d 184, 187 (Ala. Cr. App. 1986) (quoting Government of the Virgin Islands v. Carmona, 422 F.2d 95, 99 n.6 (3d Cir. 1970) ). See also People v. Perry, 61 N.Y.2d 849, 473 N.Y.S.2d 966, 966-67, 462 N.E.2d 143, 143-44 (App. 1984) ('[a] charge on intoxication should be given if there is sufficient evidence of intoxication in the record for a reasonable person to entertain a doubt as to the element of intent on that basis')."
Fletcher v. State, 621 So.2d 1010, 1019 (Ala. Crim. App. 1993) (footnote omitted).
Smith points to testimony from Ledlow that on April 20, the day of the Thompson's kidnapping and murder, she, Foster, and Smith woke up around 10:00 a.m. or 11:00 a.m. and purchased beer. Later that day, they purchased and consumed morphine pills. Ledlow also testified that Smith telephoned her at 3:00 a.m. on April 21 and stated that "he had gotten drunk" and asked if he could park his friend's vehicle at the house of Foster's mother. (R. 834-35.) During his statement to law *1099 enforcement, Smith stated that he was already "high" when Tyrone Thompson telephoned him on the evening of April 20 and that he had been "riding around smoking and drinking all day." (State's Exhibit 60.) Smith also told law enforcement that following the abduction of Thompson, but before Thompson was murdered, he, Tyrone Thompson and Gaston purchased and consumed an 18-pack of beer.
Smith asserts that the timing of the consumption of the 18 beers also justified an instruction on felony murder. Smith argues that the jury could have reasonably believed that Smith became intoxicated after kidnapping and robbing Thompson but before Thompson's murder, thereby negating the specific intent to murder.
It is not merely, though, the consumption of intoxicating liquors or drugs that justifies an instruction on intoxication and the relevant lesser-included offenses. Pilley v. State, 930 So.2d 550, 562 (Ala. Crim. App. 2005). Instead, there must be evidence of "a disturbance of mental or physical capacities resulting from the introduction of any substance into the body." § 13A-3-2(e)(1), Ala. Code 1975. " 'The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill.' " McGowan v. State, 990 So.2d 931, 985 (Ala. Crim. App. 2003) (quoting Ex parte Bankhead, 585 So.2d 112, 121 (Ala. 1991) ). Stated differently, "the level of intoxication needed to negate intent must rise 'to the level of statutory insanity.' " Williams v. Allen, 598 F.3d 778, 790 (11th Cir. 2010) (quoting Ware v. State, 584 So.2d 939, 946 (Ala. Crim. App. 1991) ).
Indeed, there was evidence presented indicating that Smith had consumed alcohol and drugs on the day of Thompson's murder. Nevertheless, the evidence was rarely specific as to the quantities consumed. See Windsor v. State, 683 So.2d 1027, 1037 (Ala. Crim. App. 1994) ("Although, there was evidence that the appellant had been drinking beer on the day of the robbery-murder, there was no evidence concerning the quantity of beer he consumed that day at the time of the murder. Evidence that someone was drinking an alcoholic beverage is not evidence that that person was intoxicated."). Further, much of the evidence cited by Smith involved the consumption of alcohol and drugs hours before the kidnapping and murder of Thompson occurred. When the evidence was specific, it cut against a level of intoxication that would merit instructions to the jury on intoxication and lesser-included offenses. For example, Smith told law-enforcement officers during his statement that he, Tyrone Thompson, and Gaston purchased and consumed an 18-pack of beer after kidnapping Thompson. Smith added, though, that he drank "maybe, like, two beers," and that Tyrone Thompson and Gaston drank "the majority of the beer." (State's Exhibit 60, 17:30.) Throughout his statement Smith consistently minimized his consumption of alcohol on the evening Thompson was murdered. See State's Exhibit 60, 26:40, 44:40, 62:45.
Smith relies heavily on his statement to law-enforcement officers as evidence of his intoxication, but it is the statement that gives the clearest indication that there was no reasonable theory from the evidence that Smith was intoxicated. Specifically, Smith's ability to recall in detail the kidnapping, robbery, and murder of Thompson is wholly inconsistent with being intoxicated to the point of insanity. See Ex parte McWhorter, 781 So.2d 330, 342 (Ala. 2000) ("The evidence offered by McWhorter as to his alleged intoxication was glaringly inconsistent with his own statement giving detailed descriptions of the events occurring at the crime scene."). So too were Smith's attempt to hide his involvement *1100 in the crime by having Thompson's vehicle "chopped" and fleeing Alabama. See Davis v. State, 740 So.2d 1115, 1121 (Ala. Crim. App. 1998) (recognizing that a defendant's attempt to hide his involvement in the crime is inconsistent with a level of intoxication sufficient to make the defendant unable to appreciate the criminality of his conduct).
The circuit court did not commit error, plain or otherwise, in failing to instruct the jury on intoxication or lesser-included offenses. As such, this issue does not entitle Smith to any relief.
III.
Smith argues that the circuit court erred in admitting his statement to law-enforcement officers because, he says, his Miranda waiver was not voluntary, knowing, or intelligent. Specifically, Smith argues a) that his statement was involuntary because Investigator Parris undermined his Miranda warnings; and b) that his statement was involuntary because Investigator Parris promised to seek mercy on his behalf. Because Smith did not object on the grounds he now raises on appeal, this issue will be reviewed for plain error only.
In Wilkerson v. State, 70 So.3d 442 (Ala. Crim. App. 2011), this Court stated:
" 'It has long been the law that a confession is prima facie involuntary and inadmissible, and that before a confession may be admitted into evidence, the burden is upon the State to establish voluntariness and a Miranda predicate.' Waldrop v. State, 859 So.2d 1138, 1155 (Ala. Crim. App. 2000), aff'd, 859 So.2d 1181 (Ala. 2002). To establish a proper Miranda predicate, the State must prove that 'the accused was informed of his Miranda rights before he made the statement' and that 'the accused voluntarily and knowingly waived his Miranda rights before making his statement.' Jones v. State, 987 So.2d 1156, 1164 (Ala. Crim. App. 2006). 'Whether a waiver of Miranda rights is voluntarily, knowingly, and intelligently made depends on the facts of each case, considering the totality of the circumstances surrounding the interrogation, including the characteristics of the accused, the conditions of the interrogation, and the conduct of the law-enforcement officials in conducting the interrogation.' Foldi v. State, 861 So.2d 414, 421 (Ala. Crim. App. 2002). 'To prove [the] voluntariness [of the confession], the State must establish that the defendant "made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him." ' Eggers v. State, 914 So.2d 883, 898-99 (Ala. Crim. App. 2004) (quoting Lewis v. State, 535 So.2d 228, 235 (Ala. Crim. App. 1988) ). As with the Miranda predicate, 'when determining whether a confession is voluntary, a court must consider the totality of the circumstances surrounding the confession.' Maxwell v. State, 828 So.2d 347, 354 (Ala. Crim. App. 2000). The State must prove the Miranda predicate and voluntariness of the confession only by a preponderance of the evidence. See, e.g., McLeod v. State, 718 So.2d 727 (Ala. 1998) (State must prove voluntariness of confession by a preponderance of the evidence), and Smith v. State, 795 So.2d 788, 808 (Ala. Crim. App. 2000) (State must prove Miranda predicate by a preponderance of the evidence)."
70 So.3d at 460.
A.
Smith argues that his statement was involuntary because, he says, Investigator Parris undermined his Miranda warnings. Before Smith's statement, Investigator Parris confirmed that Smith had *1101 been informed of his Miranda rights by officers in Georgia. (State's Exhibit 60, 8:30.) Investigator Parris then repeated to Smith his Miranda rights. Specifically, Investigator Parris informed Smith:
"You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before questioning, if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements.
"This is your waiver of rights. It says, 'I have read this statement of my rights and I understand what my rights are. I am willing to answer questions at this time. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.'
"Okay? If you want to tell me your side of it, sign right here by the 'X' and we'll get this thing rolling."
(State's Exhibit 60, 9:05-9:40.) Smith acknowledged his waiver of his Miranda rights by signing the waiver-of-rights form. (C. 868.)
Smith concedes that he was informed of his Miranda rights, but he asserts that the subsequent waiver was rendered involuntary by the statements of Investigator Parris that immediately preceded his informing Smith of his Miranda rights:
Parris: "Got jammed up a little bit, huh?"
Smith: "Yeah."
Parris: "That's the reason we want to talk to you today, see if we can get some of this stuff straightened out, and get you back on the right road and get your life straightened back out. What you think about that?"
Smith: "That's exactly what I need."
Parris: "Listen to me Nick, okay. [Shackle waistband removed at Smith's request] We-we need to get this straight, okay? I think, Nick, man, I think this is the first time you and me has ever talked, is that right? I've never met you before, and I've been doing this for a long time, okay? Everything you've got right now is not [inaudible]. I'm going to be honest with you, that's what I'm going to do. I ain't here to beat you around the bush. I'm not here to treat you bad in any way whatsoever, okay? I'm here to shoot you straight. Let's get to the truth of all this, and let's put it behind us, okay? Let's get you on the right track but, uh, let's go with it from there, okay? You already spoke with Investigator Hartman and Investigator Thompson back in Georgia. Remember doing [inaudible] with them?"
Smith: [Nods affirmatively]
Parris: "We're going to kind of go over some things that y'all discussed with them too, alright? They read you your rights over there, is that correct?"
Smith: "Yeah."
Parris: "Okay, I'm going-I'm going to go over them again to make sure you understand them, okay? If you have any questions you just stop and ask me and I'll explain it to you. Once we get this out of the way I will let you tell your side of it and we'll get this taken care of and get you back on the right track."
(State's Exhibit 60, 7:20-9:05.)
Relying on Hart v. Attorney Gen. of the State of Fla., 323 F.3d 884 (11th Cir. 2003), and United States v. Beale, 921 F.2d 1412 (11th Cir. 1991), Smith contends that Investigator Parris suggested that, contrary to the Miranda warning that his statements could be used against him, Smith's *1102 speaking with law enforcement would be helpful to him.
Hart and Beale are distinguishable from the instant case. In Hart, the suspect, having been informed of his Miranda rights, asked an officer he trusted about the pros and cons of having an attorney, which indicated that the suspect did not fully understand his rights. The officer answered that "the disadvantage of having a lawyer present was that the lawyer would tell [the suspect] not to answer incriminating questions"; in other words, the officer turned an advantage into a disadvantage. Hart, 323 F.3d at 894. The officer also told the suspect that "honesty wouldn't hurt him." Id. In Beale, officers told a Cuban-born suspect who had achieved only a fifth-grade education and who was unable to speak English or read Spanish that "signing the waiver form would not hurt him." Beale, 921 F.2d at 1435. The suspect gave unrebutted testimony that he signed the waiver form only after being "told that it would not hurt him." Id. In both cases, the United States Court of Appeals for the Eleventh Circuit held that the suspects' Miranda waivers had been rendered involuntary by the statements of the interrogating officers.
Unlike the suspect in Hart, Smith was not misled regarding the importance of an attorney, and he gave no indication that he did not understand his rights. Smith's understanding his rights is unsurprising given Smith's extensive experience with the criminal-justice system-at the time of his statement, Smith had already faced arrest multiple times and had been found guilty of two felonies. (C. 340-41.) See Jackson v. State, 562 So.2d 1373, 1381 (Ala. Crim. App. 1990) (noting that experience with the criminal-justice system is a factor to be considered in determining the voluntariness of a statement). Unlike the suspect in Beale, Smith was neither poorly educated nor had difficulty with the English language-there was evidence before the circuit court indicating that Smith had obtained his high school equivalency diploma and that he was enrolled in a local community college at the time his statement was given. (C. 342.) See Lewis v. State, 535 So.2d 228, 235-36 (Ala. Crim. App. 1988) (noting that intellect and education are factors to be considered in determining the voluntariness of a statement). Further distinguishing the instant case from Hart and Beale is the fact that there was no direct promise to Smith that a confession would be harmless.
Smith was provided food and water during his statement; Smith had received his high-school-equivalency diploma and was enrolled in a community college at the time he made the statement; Smith had had extensive experience with the criminal-justice system; and Investigator Parris's informing Smith of his Miranda rights was at least the second time Smith had been informed of his rights since he was arrested in Georgia. Based on the totality of the circumstances, the State carried its burden of showing that Smith made a voluntary waiver of his Miranda rights. See Hosch v. State, 155 So.3d 1048, 1093 (Ala. Crim. App. 2013). As such, the circuit court did not commit error, plain or otherwise, in admitting Smith's statement, and this issue does not entitle him to relief.
B.
Smith argues that his statement was involuntary because, he says, Investigator Parris promised to seek mercy on his behalf. Smith's statement to Investigator Parris included several versions of the events culminating in Thompson's murder. Smith contends that his full confession was coaxed by Investigator Parris's promising to seek mercy on his behalf:
Parris: "Right now is your time to tell your side of it and not leave anything *1103 out. Because right now, you know [Tyrone Thompson and Gaston] are going to testify against you. That's what both of them is going to want to do because they know how this is going to go down. They know this was a sloppy, sloppy crime that happened. We've got probably some of our best evidence people around on it. I'm getting-I'm getting phone calls every other hour with just more and more and more evidence, not counting what Tyrone [Thompson] and [Gaston] is telling me, so I need to hear your side of it and have this happen from your perspective. I know you were there when all this went down. I know you were there. At least give me the opportunity, Nick, of telling this DA's office over here, hey, Nick screwed up: Nick got a drug problem. You-you admit that right? Now when you're on drugs, don't that make you do things you normally wouldn't do? Would you agree? Whether it be alcohol, whether it be marijuana, any other drugs you use or just them two?"
Smith: "Um, I popped a couple pills. I don't even pop pills."
Parris: "You know, pills, it make you do shit you normally wouldn't do. Right now, Nick, right now is the time to make things right, to tell your side of it, and I think some things you told me were the truth but you're leaving out part of it."
Smith: "Can I please get something to drink?"
Parris: "Yeah."
[Investigator Martin leaves to retrieve a bottle of water for Smith]
Parris: "We've got to hear your side of it."
Smith: "I was just so scared."
Parris: "Listen to me, listen to me, listen to me. How-how do you want this to go down? Do you want me standing up there going, hey this is what Nick told me. You watch TV don't you? You know how this is about to go. Or do you want us sitting up there and saying, hey Nick screwed up? He made a bad decision. He's got this problem. He was honest with us. He laid it out there for us. He's asking for mercy. Which way you want it to roll?"
Smith: "That's exactly what I'm looking for."
Parris: "Well, you need to tell me the truth, the whole truth from beginning to the end. So start me back over and you walk me through everything."
(State's Exhibit 60, 22:55-25:00). After Investigator Parris confronted Smith with evidence that Smith had told others that he had cut Thompson, the following occurred:
Parris: "I got to get to the whole truth, here, okay? If you cut [Thompson], but didn't kill him I need to know. Because that's what, right now, is what everything is telling me, but you. We've got to be 100 percent truthful here, Nick. We've got to be. That's the only thing that's going to help you. Did you cut him and it didn't kill him? Where did you cut him at?"
Smith: "His throat."
(State's Exhibit 60, 53:15-53:45.) Smith argues that the preceding excerpt is evidence that Investigator Parris conditioned his previous promise to seek mercy on Smith's further inculpating himself.
As the record makes clear, Investigator Parris did not offer to seek mercy or leniency for Smith. On the contrary, Investigator Parris offered only to inform the district attorney's office of Smith's cooperation, Smith's drug problem and that Smith was asking for mercy. Based on the totality of the circumstances, Smith's statement was not rendered involuntary by *1104 Investigator Parris's offer. As such, the circuit court did not commit error, plain or otherwise, in admitting Smith's statement, and this issue does not entitle him to relief.
IV.
Smith argues that the circuit court erred in failing to exclude improper character evidence and evidence of prior bad acts. Specifically, Smith argues that it was error for the circuit court to admit: a) photographs of him that depicted his tattoos; b) photographs of him that depicted him in restraints; c) evidence indicating that he previously had been incarcerated and that he was serving a term of probation at the time Thompson was murdered; and d) evidence in the form of 9mm ammunition and a receipt for a 9mm pistol that was unconnected to Thompson's murder. Because Smith did not object on the grounds he now raises on appeal, this issue will be reviewed for plain error only.
Rule 404(b), Ala. R. Evid., provides, in relevant part, that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Rule 404(b) acts as a general exclusionary rule:
" ' "On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question." ' Pope v. State, 365 So.2d 369, 371 (Ala. Cr. App. 1978), quoting C. Gamble, McElroy's Alabama Evidence § 69.01. (3d ed. 1977). ' "This exclusionary rule is simply an application of the character rule which forbids the State to prove the accused's bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors." ' Ex parte Arthur, 472 So.2d 665, 668 (Ala. 1985), quoting McElroy's supra, § 69.01(1). Thus, the exclusionary rule serves to protect the defendant's right to a fair trial. ' "The jury's determination of guilt or innocence should be based on evidence relevant to the crime charged." ' Ex parte Cofer, 440 So.2d 1121, 1123 (Ala. 1983) ; Terrell v. State, 397 So.2d 232, 234 (Ala. Cr. App. 1981), cert. denied, 397 So.2d 235 (Ala. 1981) ; United States v. Turquitt, 557 F.2d 464, 468 (5th Cir. 1977)."
Robinson v. State, 528 So.2d 343, 347 (Ala. Crim. App. 1986).
A.
Smith argues that it was error for the circuit court to admit photographs of him that showed his tattoos. State's Exhibit 94 consisted of 28 photographs of Smith that were taken following Smith's statement to Investigator Parris. Smith describes the photographs as follows:
"In one close up photo, along the lower side of his right forearm, is the word "gangsta" in large, graffiti-like block letters. (C. 657.) The shoulders and upper area of both arms are covered with gang-related tattoos, signifying membership in the Gangster Disciples. These include two hands forming a gang sign with the letters 'BOS' for 'Brothers of the Struggle,' a trident with the letters G, D, and N for 'Gangster Disciple Nation,' and a small six-pointed star (C. 653-54), as well as a large six-pointed *1105 star with the letters 'GD' (C. 658). Additional Gangster Disciples tattoos included 'MMM'-an abbreviation for "money, macks, murder"-and '74,' which represents G and D-the seventh and fourth letters of the alphabet. (C. 653-54.)
"Two photos depicted a tattoo taking up the entirety of Mr. Smith's right lower leg, where the words 'looks like $ $ $' appear in large block letters on a backdrop of stacks of 100 dollar bills and several large diamonds. (C. 648.) On Mr. Smith's right hand is the word 'dirty,' and on his left is the word 'south.' (C. 647, 653-55.) In nearly all the photos, Mr. Smith is shirtless and wearing baggy jeans that fit low on his waist such that several inches of his underwear are visible. (See, e.g., C. 659-60.)"
(Smith's brief, at 43-44.)
One of the photographs does indeed depict the word "gangsta" on Smith's right forearm. This Court would have to rely on Smith's brief on appeal for the interpretation of the remaining tattoos because the record contains no explanation of their meaning or significance-which is to say that there is no evidence the jury was aware or made aware of the meaning or significance of tattoos such as "MMM" or "74."
Even if this Court were to hold that the photographs constituted evidence of other crimes, wrongs, or acts, the photographs would not violate Rule 404(b) because they were admissible for another purpose. "The general rule excluding character evidence does not bar evidence of specific acts when that evidence is offered for some purpose other than the impermissible one of proving action in conformity with a particular character." Committee Comments to Rule 404(b), Ala. R. Evid. Specifically, the photographs were relevant to identify Smith as the individual who appeared in the security footage obtained from various ATMs and stores.
The circuit court did not commit error, plain or otherwise, in admitting State's Exhibit 94. As such, this issue does not entitle Smith to any relief.
B.
Smith argues that the circuit court erred in admitting photographs of him that depicted him in restraints. Smith also appeared in restraints for portions of his recorded statement to law enforcement. Smith argues that the images undermined the presumption of innocence he should have been accorded and the formal dignity of the circuit court. See Deck v. Missouri, 544 U.S. 622, 630-31, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005), abrogated on other grounds by Fry v. Pliler, 551 U.S. 112, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007).
"This Court has recognized that there is a distinction between the jury's observing a defendant wearing handcuffs in the courtroom for his or her trial and the jury's observing the defendant wearing handcuffs in a videotape that is shown to the jury during trial." Shaw v. State, 207 So.3d 79, 97 (Ala. Crim. App. 2014). In Doster v. State, 72 So.3d 50 (Ala. Crim. App. 2010), this Court stated:
" ' "The presumption of innocence, although not articulated in the Constitution, is a basic component of our system of criminal justice." United States v. Dawson, 563 F.2d 149, 151 (5th Cir. 1977) (citations omitted). A government entity violates that presumption of innocence when it "compels an accused to stand trial before a jury while dressed in identifiable prison garb." United States v. Birdsell, 775 F.2d 645, 652 (5th Cir. 1985).'
" United States v. Pryor, 483 F.3d 309, 311 (5th Cir. 2007). However, we have not extended the violation of the presumption of innocence to the viewing of the defendant on a videotape while he is *1106 in handcuffs. As the United States Court of Appeals for the Eleventh Circuit stated in Gates v. Zant, 863 F.2d 1492 (11th Cir. 1989) :
" 'Gates' other challenge to the videotaped confession is that its admission was unduly prejudicial because it portrayed him in handcuffs. As we have noted previously, although the handcuffs are not always visible, it is evident throughout the fifteen-minute tape that the defendant is handcuffed. We are aware of no cases which address the propriety of handcuffing during a videotaped confession. Nonetheless, the resolution of the issue is apparent from earlier cases addressing handcuffing in and around trials.
" 'The principal difficulty arising from shackling or handcuffing a defendant at trial is that it tends to negate the presumption of innocence by portraying the defendant as a bad or dangerous person. The Supreme Court has referred to shackling during trial as an "inherently prejudicial practice" which may only be justified by an "essential state interest specific to each trial." Holbrook v. Flynn, 475 U.S. 560, 569, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986). See also Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). This court recently has extended the general prohibition against shackling at trial to the sentencing phase of a death penalty case. Elledge v. Dugger, 823 F.2d 1439, 1450-52 (11th Cir. 1987), modified, 833 F.2d 250 (1987), cert. denied, 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988).
" 'On the other hand, a defendant is not necessarily prejudiced by a brief or incidental viewing by the jury of the defendant in handcuffs. Allen v. Montgomery, 728 F.2d 1409, 1414 (11th Cir. 1984) ; United States v. Diecidue, 603 F.2d 535, 549-50 (5th Cir. 1979), cert. denied sub nom. Antone v. United States, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781, 446 U.S. 912, 100 S. Ct. 1842, 64 L.Ed. 2d 266 (1980) ; Wright v. Texas, 533 F.2d 185, 187-88 (5th Cir. 1976) ; Jones v. Gaither, 640 F.Supp. 741, 747 (N.D.Ga.1986), aff'd without opinion, 813 F.2d 410 (11th Cir. 1987). The new fifth circuit is among those circuits which adhere to this rule. King v. Lynaugh, 828 F.2d 257, 264-65 (5th Cir. 1987), vacated on other grounds, 850 F.2d 1055 (5th Cir. 1988) ; see also United States v. Williams, 809 F.2d 75, 83-86 (1st Cir. 1986), cert. denied, 481 U.S. 1030, 107 S.Ct. 1959, 2469, 2484, 95 L.Ed.2d 531, 877, 96 L.Ed. 2d 377 (1987); United States v. Robinson, 645 F.2d 616, 617-18 (8th Cir. 1981), cert. denied, 454 U.S. 875, 102 S.Ct. 351, 70 L.Ed.2d 182 (1981). In these latter cases, the courts generally have held that the defendant must make some showing of actual prejudice before a retrial is required.
" 'Thus, the case law in this area presents two ends of a spectrum. This case falls closer to the "brief viewing" end of the spectrum and requires a showing of actual prejudice before a retrial is required. The prosecution showed the fifteen-minute tape twice during several days of trial. The handcuffs were only visible during short portions of the tape.
" 'Gates has made no attempt to show that he suffered actual prejudice because the jury saw him in handcuffs. Our independent examination of the record also persuades us that he did not suffer any prejudice. Although defense counsel strenuously objected to the admission of the videotape, he did not object to the handcuffing in particular. He did not ask for a cautionary *1107 instruction or a poll of the jury. Furthermore, the videotape at issue here was taken at the scene of the crime, not at the police station. Thus, jurors likely would infer that handcuffing was simply standard procedure when a defendant is taken outside the jail. The viewing of the defendant in handcuffs on television rather than in person further reduces the potential for prejudice. In light of the foregoing facts, and the fact that Gates sat before the jury without handcuffs for several days during his trial, we conclude that the relatively brief appearance of the defendant in handcuffs on the videotape did not tend to negate the presumption of innocence or portray the defendant as a dangerous or bad person. We therefore conclude on the particular facts of this case that the handcuffing of Gates during the videotaped confession does not require a new trial."
" 863 F.2d at 1501-02. See also Barber v. State, 952 So.2d 393 (Ala. Crim. App. 2005)."
Doster, 72 So.3d at 85-86.
At the beginning of State's Exhibit 60, Smith enters the interrogation room while wearing leg irons, which are not visible, and handcuffs that are attached to a waistband. The handcuffs were removed while Investigator Parris introduced himself and the waistband was removed soon thereafter. The restraints were placed on Smith at the conclusion of State's Exhibit 60. Four photographs in State's Exhibit 94 depict Smith in leg irons.
The jury's view of Smith's restraints was brief, and the jurors likely believed that the restraints were " 'simply standard procedure.' " Doster, 72 So.3d at 86 (quoting Gates, 863 F.2d at 1502 ). Further, Smith's presumption of innocence was likely dispelled during his opening statement when he conceded his role in Thompson's murder. (R. 574-76) ("In this case, I wish I could stand up here with a straight face and say Nicholas Smith had nothing to do with any of this. ... It would be a lie, and it wouldn't be true, and I couldn't do it."). There is no indication that Smith suffered any prejudice as a result of the circuit court's admitting the depictions of him in restraints. As such, this issue does not entitle him to any relief.
C.
Smith argues that the circuit court erred in admitting evidence indicating that he previously had been incarcerated and that he was serving a term of probation at the time Thompson was murdered. Taesha Pulliam, the mother of Gaston's children, testified that she "met [Smith] when he first got out of jail. I think he was just maybe a day or two out of jail." (R. 1195.) Investigator Brian Thompson stated that Smith was detained in Georgia based on an arrest warrant issued in connection with a probation violation. There was also a reference to Smith's arrest warrant for a probation violation during Smith's statement to law enforcement. Smith argues that, in violation of Rule 404(b), Ala. R. Evid., this evidence alerted the jury that "had previously been arrested, jailed, convicted, and put on probation for some prior act." (Smith's brief, at 47.) See Spradley v. State, 128 So.3d 774, 789-92 (Ala. Crim. App. 2011).
Initially, this Court points out that the jury was not informed in the guilt phase of the nature of the conviction for which Smith was on probation.[4] Additionally, the references were brief and neither sought *1108 nor belabored by the State. With the backdrop of the overwhelming evidence of Smith's guilt and Smith's trial strategy, " '[i]t is inconceivable that a jury could have been influenced, under the circumstances here, to convict [Smith] of crimes of the magnitude charged here because of [ ] oblique reference[s] to a prior criminal record.' " Belisle v. State, 11 So.3d 256, 293 (Ala. Crim. App. 2007) (quoting Thomas v. State, 824 So.2d 1, 20 (Ala. Crim. App. 1999), overruled on other grounds, Ex parte Carter, 889 So.2d 528 (Ala. 2004) ).
Any error in the admission of the references to Smith's criminal record did not rise to the level of plain error. As such, this issue does entitle Smith to any relief.
D.
Smith argues that the circuit court erred in admitting evidence of 9mm ammunition and a receipt for a 9mm pistol that was unconnected to Thompson's murder. The receipt and ammunition were recovered from a trash can used by Cheryl Bush, Tyrone Thompson's girlfriend. The items were referenced at trial as part of an inventory of items collected from the trash can that were sent for forensic testing.
As Smith argues, the evidence was neither connected to Smith nor to Thompson's murder. The evidence was simply mentioned to the jury as part of an inventory of items collected during a search. It is inconceivable that Smith was prejudiced by the admission of this evidence. Any error in the admission of the evidence did not rise to the level of plain error. As such, this issue does entitle Smith to any relief.
V.
Smith argues that the circuit court erred in admitting statements of his nontestifying codefendants that implicated him in Thompson's murder. Smith argues that the statements were inadmissible hearsay and that the admission of the statements violated his right to confront the witnesses against him. See Rule 802, Ala. R. Evid.; U.S. Const. Amend. VI. Because Smith did not object on the grounds he now raises on appeal, this issue will be reviewed for plain error only.
" 'The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." ' Crawford v. Washington, 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Thus, 'the Sixth Amendment [prohibits the admission of] testimonial hearsay [statements offered for the truth of the matter asserted], ... and interrogations by law enforcement officers fall squarely within that class.' Crawford, 541 U.S. at 53 [124 S.Ct. 1354] ; see also Id. at 59 n.9 [124 S.Ct. 1354] ; (citing Tennessee v. Street, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985) (explaining that the Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted')). Similarly, under the Alabama Rules of Evidence:
" ' "Hearsay is not admissible except as provided by [the Alabama Rules of Evidence], or by other rules adopted by the Supreme Court of Alabama or by statute." Rule 802, Ala. R. Evid. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), Ala. R. Evid.'
" Hillard v. State, 53 So.3d 165, 167 (Ala. Crim. App. 2010). Accordingly,
" 'It is well settled that[, when offered for the truth of the matter asserted,] a nontestifying codefendant's statement to police implicating the accused in the crime is inadmissible *1109 against the accused; it does not fall within any recognized exception to the hearsay rule and ... [it] violates the accused's confrontation rights. See Lee v. Illinois, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) ; Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) ; R.L.B. v. State, 647 So.2d 803 (Ala. Crim. App. 1994) ; Ephraim v. State, 627 So.2d 1102 (Ala. Crim. App. 1993).'
" Jackson v. State, 791 So.2d 979, 1024 (Ala. Crim. App. 2000). See also Lilly v. Virginia, 527 U.S. 116, 139, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (holding that the admission of an accomplice's out-of-court confession violated the petitioner's Confrontation Clause rights); Hillard, 53 So.3d at 169 (holding that a codefendant's statement to police was inadmissible hearsay under Rule 802, Ala. R. Evid.)."
Turner v. State, 115 So.3d 939, 943-44 (Ala. Crim. App. 2012).
At trial, Investigator Martin testified to Tyrone Thompson's implicating Smith:
State: "Don't tell me what [Tyrone Thompson] said or what his involvement may or may not have been, but during the process of talking to Tyrone Thompson early on in this investigation did he name any people other than himself that may be involved?"
Martin: "Yes, sir."
State: "Do you remember what those names were?"
Martin: "He gave us the name of Nick, Castro, Nick Smith."
(R. 1117.) Investigator Martin gave similar testimony about Gaston's statement to law enforcement:
State: "Don't tell me anything [Gaston] said but did he like the question with [Tyrone] Thompson, did he indicate any other people that might have [been] involved in the crime other than himself?"
Martin: "Yes, sir."
State: "Who was that?"
Martin: "He said Nick. He didn't know-he called him Ricky or Nicky, I think is what he said in the interview, and Tyrone Thompson."
(R. 1130-31.) Investigator Parris made the following statement during Smith's statement:
"I talked to Dwayne [Gaston]. Dwayne's in jail, okay? Dwayne's laid it out there for us. I talked to Tyrone. Tyrone's in jail. Tyrone's laid it out there for us, okay? Here's the problem we're running into, Nick. I've got all kinds of evidence, all right? All kinds. Right now, I know you were involved a lot more than what you're telling me, okay? Just by their statements, just by the evidence I got, all right? You're not helping yourself by leaving this out because you want to know what Dwayne and Tyrone told me? They're throwing you under the bus. They're trying to save their asses.
"Listen to me-listen to me. Right now is your time to tell your side of it and not leave anything out. Because right now, you know they are going to testify against you. That's what both of them is going to want to do because they know how this is going to go down. They know this was a sloppy, sloppy crime, that happened, okay? We got probably some of our best evidence people around on it. I'm getting phone calls every other hour with just more and more and more evidence, okay? Not counting what Tyrone and Dwayne is telling me. So I need to hear your side of it and have this happen from your perspective. Nick, I *1110 know you were there when all this went down."
(State's Exhibit 60, 22:00-23:45.)
Smith relies on Turner for his conclusion that the admission of the aforementioned statements by Investigator Martin and Investigator Parris constituted reversible error. In Turner, this Court stated:
"Here, the State offered evidence establishing that Turner's accomplices gave confessions to police officers and, in those confessions, stated that, during the commission of the crime, Shah 'grabbed the phone[, and Turner] said f*** this and ... shot [Shah].' ... The State also offered evidence that the accomplices told the police officers that Turner murdered Shah. The confessions of Turner's accomplices to police officers were, without a doubt, testimonial. ... Further, during closing arguments, the State used the accomplices' statements to show that Turner intended to kill Shah. ... The State's use of the accomplices' statements during closing argument leaves no room to doubt that the statements were offered for the truth of the matter asserted."
Turner, 115 So.3d at 944 (citations omitted).
The circumstances here are distinguishable from those in Turner; Investigator Martin and Investigator Parris did not reveal the content of Tyrone Thompson's or Gaston's statements. Instead, the investigators used vague references to Tyrone Thompson's and Gaston's statements. Additionally, the testimony of Investigator Martin was not hearsay because it was not offered to prove the truth of the matter asserted; rather, the testimony was offered to explain the course of the investigation. See Jackson v. State, 169 So.3d 1, 106-07 (Ala. Crim. App. 2010) ; Robitaille v. State, 971 So.2d 43, 58-59 (Ala. Crim. App. 2005) ; D.R.H. v. State, 615 So.2d 1327, 1330 (Ala. Crim. App. 1993). This Court has considered statements similar to those made by Investigator Parris and held:
"The references in Revis's interrogation to the statements of his uncle and brother were harmless error, if error at all. The investigators' allusions to a statement by Revis's uncle were a tactic used to elicit a confession from Revis and were interwoven in Revis's confession. These references were introduced to explain the circumstances of the confession and could be considered by the jury in weighing Revis's statements."
Revis v. State, 101 So.3d 247, 277 (Ala. Crim. App. 2011). Finally, "[n]either [Tyrone Thompson] nor [Gaston] testified ... nor were any statements made by them received into evidence; thus, [Smith] had no right to confront or to cross-examine either of these two individuals." D.R.H., 615 So.2d at 1330.
Any error in the circuit court's admitting references to Tyrone Thompson's and Gaston's statements did not rise to the level of plain error. As such, this issue does not entitle Smith to any relief.
VI.
Smith argues that the circuit court erred in admitting what he characterizes as irrelevant, cumulative, and highly prejudicial photographs of the crime scene and the autopsy. Smith contends that the photographs were irrelevant because he did not challenge Thompson's injuries or the manner of his death. In addition, some of the photographs depicted the decomposition of Thompson's body and face, replete with insect larvae. Smith asserts that the larvae caused injuries that could not be attributable to him and that the images of the decomposition were gory and inflammatory. Smith likewise argues that the photographs of Thompson's autopsy were gruesome and irrelevant. Finally, *1111 Smith argues that it was improper for the prosecutor to reference a photograph of Thompson's body during guilt-phase closing argument: "This is from State's Exhibit 114. This is Kevin Thompson after spending about six hours with Nick Smith. Think about that as you make your decision." (R. 1926.) Because Smith did not object on the grounds he now raises on appeal, this issue will be reviewed for plain error only.
This Court has repeatedly held:
" 'Generally, photographs are admissible into evidence in a criminal prosecution "if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.' " Bankhead v. State, 585 So.2d 97, 109 (Ala. Crim. App. 1989), remanded on other grounds, 585 So.2d 112 (Ala. 1991), aff'd on return to remand, 625 So.2d 1141 (Ala. Crim. App. 1992), rev'd, 625 So.2d 1146 (Ala. 1993), quoting Magwood v. State, 494 So.2d 124, 141 (Ala. Crim. App. 1985), aff'd, 494 So.2d 154 (Ala. 1986). 'Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome.' Williams v. State, 506 So.2d 368, 371 (Ala. Crim. App. 1986) (citations omitted). In addition, 'photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.' Ex parte Siebert, 555 So.2d 780, 784 (Ala. 1989). 'This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim's injuries.' Ferguson v. State, 814 So.2d 925, 944 (Ala. Crim. App. 2000), aff'd, 814 So.2d 970 (Ala. 2001). ' "[A]utopsy photographs depicting the character and location of wounds on a victim's body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter." ' Jackson v. State, 791 So.2d 979, 1016 (Ala. Crim. App. 2000), quoting Perkins v. State, 808 So.2d 1041, 1108 (Ala. Crim. App. 1999), aff'd, 808 So.2d 1143 (Ala. 2001), judgment vacated on other grounds, 536 U.S. 953 [122 S.Ct. 2653, 153 L.Ed.2d 830] (2002), on remand to, 851 So.2d 453 (Ala. 2002)."
Brooks v. State, 973 So.2d 380, 393 (Ala. Crim. App. 2007).
This Court has reviewed the crime-scene and autopsy photographs and the related testimony. The photographs were relevant and admissible to establish the injuries Thompson sustained. See Gobble v. State, 104 So.3d 920, 963-64 (Ala. Crim. App. 2010) (holding that autopsy photographs were gruesome yet necessary to demonstrate to the jury the extent of the victim's injuries (quoting Dabbs v. State, 518 So.2d 825, 829 (Ala. Crim. App. 1987) )). "The photographs and testimony relating to postmortem animal and insect activity were also relevant and admissible to distinguish between the injuries [Smith] caused and the injuries that he did not." Kelley v. State, 246 So.3d 1032, 1051 (Ala. Crim. App. 2014), rev'd in part on unrelated grounds by Ex parte Kelley, 246 So.3d 1068 (Ala. 2015). Although unpleasant, the photographs and testimony were not unduly gruesome or unfairly prejudicial. Consequently, this Court holds that the prejudicial effect of the evidence was not substantially outweighed by its prejudicial effect. Id.; see also Rule 403, Ala. R. Evid. ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.").
*1112 With respect to the prosecutor's referencing a picture of Thompson's body during closing argument, we have held that such argument, when viewed in the context of the entire trial, "constituted appropriate comments about the evidence presented at trial." Peraita v. State, 897 So.2d 1161, 1201-02 (Ala. Crim. App. 2003).
The circuit court did not commit error, plain or otherwise, in admitting photographs of the crime scene and the autopsy. As such, this issue does not entitle Smith to any relief.
VII.
Smith argues that he was convicted of two counts of capital murder and given multiple punishments based on a single robbery in violation of the Double Jeopardy Clause. In count 1 of the indictment against him, Smith was charged with and convicted of murder made capital because it was committed during a first-degree kidnapping "with the intent to accomplish or aid the commission of any felony, to wit: a Robbery or flight therefrom."[5] In count 2, Smith was charged with and convicted of murder made capital because it was committed during a first-degree robbery. "[T]he Double Jeopardy Clause, as a general rule, prohibits the State from subjecting a defendant to multiple punishments for the same offense." Ex parte Rice, 766 So.2d 143, 148 (Ala. 1999). "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (citations omitted). Smith argues that his capital-murder convictions fail the Blockburger test because "both charges required the State to establish Murder during a Robbery. Only Count 1 contained the extra element of abducting a victim." (Smith's brief, at 77.) Thus, Smith argues, capital murder/robbery is a lesser-included offense of capital murder/kidnapping under the counts in this case. Because Smith did not object on the grounds he now raises on appeal, this issue will be reviewed for plain error only.
This Court has previously considered and rejected Smith's argument:
"Pursuant to § 13A-6-43(a), [Ala. Code 1975,] kidnapping in the first degree requires the abduction of another person coupled with one of six different goals of criminal intent: to hold the victim for ransom; to use him as a shield or a hostage; to accomplish or aid in the commission of a felony or flight therefrom; to inflict injury or to abuse sexually the victim; to terrorize the victim or a third person; and to interfere with any governmental or political function. In the present case, the goal of the appellant's criminal intent in committing the abduction was to accomplish or aid in the commission of a felony, specifically, robbery. The commentary to this kidnapping statute states as follows:
" 'Note that none of the purposes listed in § 13A-6-43(a)(1)-(6) must be actually accomplished in order for the crime of kidnapping to be committed; the crime is complete when there is an "abduction," i.e., intentional or knowing restraint, coupled with an intent to secrete or to hold the victim where he is not likely to be found, or use, or threaten to use deadly physical force. Section 13A-6-40(1) and (2). Proof of any one of the additional purposes increases the gravity of the offense.
*1113 All of these criminal purposes pose substantial danger to the life of the victim or afford a strong incentive to kill him in order to avoid identification or apprehension.'
"Thus, because the intended purpose of the abduction need not be completed, while the felony of robbery was required to be completed in the first count, Count one was not a lesser-included offense of Count two, and the appellant's rights against double jeopardy were not violated."
Smith v. State, 838 So.2d 413, 468-69 (Ala. Crim. App. 2002).
Based on this Court's holding in Smith, no error, plain or otherwise, occurred with respect to charging and convicting Smith of both capital murder/kidnapping and capital murder/robbery. As such, this issue does not entitle Smith to any relief.
VIII.
Smith argues that the circuit court failed to adequately charge the jury on reasonable doubt. Smith argues that the instructions of the circuit court emphasized that not all doubts are sufficient to require acquittal, which, he says, lessened the State's burden of proof. Because Smith did not object on the ground he now raises on appeal, this issue will be reviewed for plain error only.
This Court has explained:
" ' "The Due Process Clause of the Fourteenth Amendment 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970).... [T]he Court 'made it clear that the proper inquiry is not whether the instruction "could have" been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it.' Victor v. Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994) (quoting Estelle v. McGuire, 502 U.S. 62, 72-73, and n.4, 112 S.Ct. 475, 482 and n.4, 116 L.Ed.2d 385 (1991), emphasis in original). Thus, the constitutional question presented here is whether there is a reasonable likelihood that the jury understood the instructions to allow the conviction based on proof insufficient to meet the Winship reasonable doubt standard. Victor v. Nebraska; Ex parte Kirby, 643 So.2d 587 (Ala.), cert. denied, [513] U.S. [1023], 115 S.Ct. 591, 130 L.Ed.2d 504 (1994) ; Cox v. State, 660 So.2d 233 (Ala. Cr. App. 1994).
" ' "In reviewing the reasonable doubt instruction, we do so in the context of the charge as a whole. Victor v. Nebraska; Baker v. United States, 412 F.2d 1069 (5th Cir. 1969), cert. denied, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970) ; Williams v. State, 538 So.2d 1250 (Ala. Cr. App. 1988). So long as the definition of 'reasonable doubt' in the charge correctly conveys the concept of reasonable doubt, the charge will not be considered so prejudicial as to mandate reversal. Victor v. Nebraska; Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954)." ' "
Lewis v. State, 24 So.3d 480, 518-19 (Ala. Crim. App. 2006) (quoting Lee v. State, 898 So.2d 790, 841-42 (Ala. Crim. App. 2001), quoting in turn Knotts v. State, 686 So.2d 431, 459 (Ala. Crim. App. 1995) ).
During guilt-phase instructions to the jury, the circuit court gave the following instruction on reasonable doubt:
"Before a conviction can be had in this case, the State must satisfy each and every member of the jury of the defendant's *1114 guilt beyond a reasonable doubt. Even if the State demonstrates a probability of guilt, if it does not establish it beyond a reasonable doubt, it would be your obligation to acquit the defendant. The phrase reasonable doubt is self-explanatory. Efforts to define it don't always clarify it. Sometimes it's easier to tell you initially what it's not then tell you what it is.
"First, it's not a mere possible doubt because everything related to human affairs is open to some possible or imaginary doubt. A reasonable doubt is a doubt of a fair-minded juror, honestly seeking the truth, after careful and impartial consideration of all the evidence in the case. It's the doubt based on reason and based on common sense. It doesn't mean a vague or arbitrary notion. It's an actual doubt based upon the evidence, lack of evidence, a conflict in the evidence or combination of all those. It's a doubt that remains after going over in your mind the entire case and giving consideration to all the testimony. It's distinguishable from a doubt arising from mere possibility for bare imagination or fanciful conjecture."
(R. 1964-66.) The circuit court gave a similar instruction to the jury during the penalty phase. (R. 2424-25.)
This Court holds that the instruction on reasonable doubt could not be reasonably interpreted to lower the State's burden of proof. See Albarran v. State, 96 So.3d 131, 190-91 (Ala. Crim. App. 2011) (holding that there was no reasonable likelihood that the jury applied substantially similar instructions in a manner that would unconstitutionally lower the State's burden of proof). No error, plain or otherwise, resulted from the circuit court's instruction on reasonable doubt. As such, this issue does not entitle Smith to any relief.
IX.
Smith argues that the circuit court erred by allowing the State to elicit and argue the opinions of Thompson's family to persuade the jury to recommend a sentence of death. Specifically, Smith argues that the State improperly elicited testimony from Frances Curry and Rena Curry regarding their characterization of Smith, his crime, and the appropriate punishment. Smith did not object to the Currys' testimony at trial; therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R. App. P.
During the penalty phase, the State asserted in its opening argument to the jurors that Thompson's mother, Frances Curry, wanted Smith to be put to death: "[The death penalty is] what his mother[, Frances Curry,] wants, and we'll put her on the stand to tell you that." (R. 2014.) The State called Curry to testify and specifically asked Curry how she wanted Smith punished. Frances Curry not only told the jury that she wanted Smith to be put to death but also told the jury that it was her opinion that Smith's killing her son was not an "accident"; that it was her opinion that the killing was not merely "a bad choice"; that it was her opinion that Smith's taking Thompson's life was Smith's "conscious choice"; that it was her characterization and opinion that "her baby" had "suffered"; that it was her opinion that "if you murder" you must be executed; and that it was her opinion that even if the jury punishes Smith with death, "[Smith] will still live longer than my baby did." (R. 2045-46.)
State: "What punishment are you asking me to pursue here in this case?"
Frances: "Death."
State: "And can you tell me why?"
Frances: "I believe if you take a life and no one is doing anything to you, that you must give your life. I believe that *1115 God said, 'Thou shall not kill.' And if you murder, you shall be murdered. I believed all those things all of my life. I'm not going to change them now. I believe this wasn't an accident. It wasn't a bad choice. It was a conscious choice. I know my baby suffered. I also believe that in death, he will still live longer than my baby did."
(R. 2045-46.)
The State also called Rena Curry, the victim's sister, and specifically asked Rena to tell the jury how she wanted Smith to be punished. Rena testified that she not only wanted Smith to be executed, but also she essentially told the jury that despite mitigating evidence reflecting that Smith had had a terrible childhood, it was her opinion that Smith was not thinking about his childhood when he murdered Thompson; and, she essentially told the jury that if you murder you must be murdered.
State: "And it would be pretty fair to say you and I have had some pretty in depth conversations getting ready for trial."
Rena: "Yes, sir."
State: "But a question I'm going to ask you-a decision I don't want to make on my own. I'm going to ask for a punishment in this case, what punishment do you want me to ask for?"
Rena: "The death penalty."
State: "Can you tell me why?"
Rena: "My Bible says an eye or an eye, tooth for a tooth. Not only that, I know that he's had a terrible childhood, but I also know that he wasn't thinking about his childhood when he took away my best friend and my big brother."
(R. 2039-40.)
The State then told the jury during its penalty-phase closing argument that in obtaining Smith's execution the State was "trying to do what [Thompson's] mother and sister asked [the State] to do." (R. 2379-80.) The State further implored the jurors to "[t]hink about Francis [sic] and Rena when you make that decision [regarding the appropriate sentence]." (R. 2414-15.)
"In Booth v. Maryland, 482 U.S. 496, 502, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the United States Supreme Court held that a defendant's Eighth Amendment rights were violated by the sentencing authority's consideration of any victim-impact evidence. In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court partially overruled Booth to allow the sentencing authority to consider evidence of the effect of the victim's death upon family and friends. Payne, 501 U.S. at 830 n.2, 111 S.Ct. 2597 ('Our holding today is limited to the holdings of [Booth] ... that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing.').
"In Ex parte McWilliams, 640 So.2d 1015 (Ala. 1993), this Court noted that Payne had only partially overruled Booth and that it had left intact the proscription against victim-impact statements containing 'characterizations or opinions of the defendant, the crime, or the appropriate punishment.' 640 So.2d at 1017. The Court in McWilliams held that a trial court errs if it 'consider[s] the portions of the victim impact statements wherein the victim's family members offered their characterizations or opinions of the defendant, the crime, or the appropriate punishment.' Id."
Ex parte Washington, 106 So.3d 441, 445 (Ala. 2011).
The appellate courts of this State have found plain error in cases where the family members of the victim were allowed to present in the penalty phase their characterizations *1116 or opinions of the defendant, the crime, or the appropriate punishment. For example, in Ex parte Washington, "the victim's parents told the jury that Washington's crime was 'brutal, evil, terrible,' that Washington was 'someone without a conscience,' and that death was the appropriate punishment." Ex parte Washington, 106 So.3d at 446. The Alabama Supreme Court held those comments to constitute plain error. In Wimberly v. State, 759 So.2d 568 (Ala. Crim. App. 1999), the stepdaughter of one of the victims read a statement into evidence in which she characterized the defendant as a "predator," a "coward," and a "murdering thief"; commented on his remorselessness; described in positive terms the life he would face in prison if he avoided a sentence of death; and asked that the defendant "be given the sentence that he has handed out: Give him death." Wimberly, 759 So.2d at 572-73. Reviewing the comments in Wimberly, this Court,
"recognize[d] the emotional devastation and loss the family members ... have suffered. Nevertheless, reviewing the remarks made by the family member to the jury during the sentencing hearing, [this Court found that] the cumulative effect of [those] improper comments to be plain error. Had the prosecutor made these same comments in argument, [this Court] would find them to be a textbook example of prosecutorial misconduct. The fact that the these same comments were read to the jury by a bereaved family member only magnifies the impact such comments surely had on the jury as it closed to deliberate on its sentence recommendation. We find that these comments were calculated to incite an arbitrary response from the jury and that they should have been excluded. Barbour v. State, 673 So.2d 461, 469 (Ala. Crim. App. 1994). If [this Court] were not already reversing this case for a new trial, [it] would set aside the sentence and remand this case to the trial court for a new sentencing phase before the jury and a new sentencing hearing before the trial court based on the admission of improper victim impact evidence. Gillespie v. State, 549 So.2d 640, 644 (Ala. Cr. App. 1989)."
Wimberly v. State, 759 So.2d 568, 573-74 (Ala. Crim. App. 1999).
Similarly, Frances Curry and Rena Curry provided the jury with their characterization of Smith and his crime, as well as their desire for the jury to recommend a sentence of death. They testified directly to their characterization and/or and opinion of Smith, the crime, and the appropriate punishment. Moreover, the trial court did not instruct the jury on how to consider this victim-impact testimony. In a case with strong mitigation,[6] such as this case, it is not clear that the improper victim-impact testimony had no influence on the jury's recommendation. Therefore, absent assurances that this testimony did not influence the jury in recommending a death sentence, it is necessary to remand this case for a new sentencing proceeding.
For the foregoing reasons, Smith's capital-murder convictions are affirmed but his sentences of death are reversed and the cause remanded with instructions for the circuit court to conduct a new penalty proceeding.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
Welch, Kellum, and Joiner, JJ., concur; Windom, P.J., concurs in part and dissents in part, with opinion; Burke, J., concurs in part and dissents as to Part IX.

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The rifle, which was later retrieved from the vehicle of Gaston's girlfriend, was apparently used only for intimidation. The weapon lacked a percussion cap, which rendered it incapable of firing.

During the testimony of Frances Curry, defense counsel stated: "Judge, as far as victim impact, I won't object to victim impact at this point, but it's obviously part of what comes in mitigation, but it comes-I object to anything as far as how it's affecting Ms. Curry and how-." (R. 596-97.) At that point, the State offered to "move on," and the circuit court sustained Smith's objection. (R. 597.)

Because Smith's being on probation at the time of Thompson's murder was an aggravating factor, the jury was informed during the penalty phase of the nature of Smith's prior convictions.

Smith's indictment offered several alternative methods of proving a kidnapping in the first degree. The State, though, proceeded only under the alternative listed.

Smith presented a significant amount of mitigating evidence during the penalty phase; evidence of what can only be described as Smith's horrific childhood was chronicled. His childhood was a haze of neglect, physical abuse, sexual abuse beginning when he was very young, abandonment, beatings, starvation, drug use beginning when his older brother "shotgunned" marijuana into Smith's mouth when Smith was two years old, alcohol use beginning when he was six years old, and criminal activity. There was testimony that he matured into a person with psychological problems.