Rel: September 27, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2023-2024

_____

## CR-2023-0820

_____

**Terrell Maurice Watts**

**v.**

**State of Alabama**

**Appeal from Jefferson Circuit Court
(CC-22-1881)**

KELLUM, Judge.

Terrell Maurice Watts was convicted of murder made capital because it was committed by or through the use of a deadly weapon fired or otherwise used within or from a vehicle. See § 13A-5-40(a)(18), Ala.

Code 1975. The State did not seek the death penalty, and the trial court sentenced Watts to life imprisonment without the possibility of parole.

The evidence adduced at trial indicated the following. In the early morning hours of October 8, 2021, Marcus Nevel and Anthony Grayson were driving around drinking alcohol in Grayson's automobile and decided to purchase drugs. Grayson drove them to "Eastlake," where they purchased crack cocaine, which they then ingested as they continued drinking. (R. 162.) Around 1:30 a.m., after consuming all the alcohol and cocaine they had, Grayson let Nevel drive Grayson's vehicle because Grayson had "already been drinking" before he had picked up Nevel and was too intoxicated to continue driving. (R. 164.) Nevel drove them to a Shell gasoline station and convenience store to purchase beer, where they saw Watts, who Nevel knew as a fellow drug user. Watts was wearing a dark blue or black hoodie and dark jeans, he had a backpack with him, and his hair was in "long dreads." (R. 167.) Watts asked Nevel and Grayson to drive him somewhere to buy drugs, and they agreed. After Nevel purchased the beer, Watts got into the backseat of the vehicle behind Grayson, who was seated in the front passenger seat.

2

Nevel drove them back to Eastlake, where they purchased more crack cocaine and split it between the three of them. Nevel described Watts as "real balanced" until "that first hit of dope," at which point, he said, Watts became "paranoid" and began "hopping" around the backseat, moving from the passenger side of the vehicle to the center of the vehicle and back again. (R. 169-70.) Watts also asked Nevel and Grayson if they had a gun in the car, and Nevel told Watts that they did not and that he should calm down. When asked if there were only three people in the vehicle at that point in time, Nevel said: "That's all it was all night." (R. 170.) After consuming the cocaine they had purchased, Watts wanted more, and Nevel drove them back to Eastlake, where they purchased more cocaine and, again, split the cocaine between the three of them. After that cocaine was gone, Watts asked if Nevel knew where he could purchase more cocaine with the $7.00 he had left. At this point, it was around 4:30 a.m. Nevel then drove to an apartment complex where he knew someone who might sell a small amount of cocaine at that hour.

When they arrived, it was still dark, but the parking lot had lights. Watts gave Nevel his money and Nevel got out of the vehicle. Nevel said that the light inside Grayson's vehicle did not illuminate when he exited

3

the vehicle. Nevel walked inside a breezeway to the apartment where his contact lived, but no one answered when he knocked on the door. Nevel returned to the vehicle and Watts asked Nevel to try again; Nevel did so, but again, no one answered. When he returned to the vehicle, Nevel, without looking, reached into the backseat and handed the money back to Watts. According to Nevel, Grayson was "out of it" in the front passenger seat at the time. (R. 174.) Nevel testified that only he, Grayson, and Watts were in the vehicle and that he saw no one walking in the area at any point while they were at the apartments.

As Nevel put the key in the ignition, he heard a "boom" and Grayson "jerked." (R. 175.) Nevel said that the shot "was real loud" and left his "ears ringing." (R. 179.) Despite seeing a flash in the backseat of the vehicle at the same time he heard the gunshot (R. 179), Nevel was unsure exactly where the shot had originated because he was "spooked" (R. 175) and "confused" (R. 181), so he began looking around, initially thinking that someone outside the vehicle had fired into the vehicle. (R. 175.) He saw no one. But he did see that the window of the front passenger-side

door had shattered,[1] and he then looked in the backseat. According to Nevel, Watts was the only person in the backseat and he had "a dumb look on his face" and was saying, "Yeah, yeah." (R. 176.) At that point, although he did not see a gun and had not seen Watts shoot Grayson, Nevel realized that Watts must have been the shooter, and Nevel became "scared for [his] life," not knowing if Watts was "going to shoot [him] in the back of the head." (R. 176.) But Nevel refused to leave Grayson, so he turned the key in the ignition and sped away, with Watts still in the backseat.

Nevel drove to a nearby gasoline station and convenience store and, when he turned on his blinker to make the turn into the parking area, Watts told Nevel to keep driving. Nevel refused and drove to the front of the convenience store, got out of the vehicle, and telephoned emergency 911. Watts took his backpack, exited the vehicle, and fled the scene. When officers arrived at the gas station, Nevel was "in a state of shock" (R. 195.) and was still intoxicated, and he indicated to police that he was not sure whether the gunshot had come from inside or outside the vehicle,

---

[1]Testimony indicated that the windows of the vehicle were tinted and that the adhesive of the tint held the window in place despite its being shattered by the bullet.

5

while simultaneously indicating that it "had" to have come from the backseat passenger. (R. 199.) Nevel gave police a description of Watts and later identified Watts in a photographic lineup (as well as at trial) as the backseat passenger.

Ashanti McKinney, a sergeant with the Jefferson County Sheriff's Department, was traveling to the gas station in response to the 911 call when he saw a man matching the description he had received over the radio about three blocks away from the gas station. Sgt. McKinney attempted to stop the man and question him, but the man ran away. A few hours later, around 9:00 a.m., police apprehended Watts about seven blocks from the gas station. At that time, Watts did not have any weapons and he was not carrying a backpack. Watts was transported to the Jefferson County Sheriff's Office, where he gave a statement. The statement was recorded and played for the jury, and this Court has reviewed that recording. Watts denied shooting Grayson, claiming that, while Nevel was away from the vehicle, a fourth man had entered the backseat of the vehicle on the driver's side and attempted to sell him a gun. Watts described the man as "chubby" with light brown skin and hair similar to Watts's own, and Watts said he had previously seen the

6

man around the apartment complex. (R. 512.) Watts said that it was this fourth man who shot and killed Grayson, after which the man fled.

Police recovered a 9mm shell casing from the backseat of Grayson's vehicle, but the murder weapon was never found. Grayson's blood was found on the jeans Watts was wearing at the time of his arrest. It was determined that the bullet that killed Grayson had been fired from inside the vehicle and had exited through the front passenger-side window. Grayson died from a gunshot wound to the head. The autopsy revealed that the bullet entered Grayson's head in the upper, back, left side of his skull and exited at his right temple. The trajectory of the bullet was "left to right and slightly downward and ... slightly back to front." (R. 436.) Stippling around the entrance wound indicated the shot had been fired from between 3 and 18 inches away. Grayson had both alcohol and cocaine in his system at the time of his death.

Watts testified on his own behalf at trial. His testimony was substantially similar to the statement he gave to police. He also testified that he was right-handed.

After both sides rested and the trial court instructed the jury on the applicable principles of law, the jury found Watts guilty of capital murder as charged in the indictment. This appeal follows.

I.

Watts first contends, as he did in the trial court, that the legislature intended § 13A-5-40(a)(18), Ala. Code 1975, to apply to drive-by shootings and not to shootings where the shooter happens to be inside a vehicle and the vehicle itself is not an instrumentality or otherwise involved in the murder. Therefore, he maintains, § 13A-5-40(a)(18) does not apply to the facts of his case and he should not have been convicted of capital murder. In support of his claim, Watts relies on Act No. 2006-642, Ala. Acts 2006, a joint resolution of the legislature, in which the Alabama Legislature indicated that its intent in passing § 13A-5-40(a)(18), Ala. Code 1975, was to prohibit gang-related "drive-by shootings" or those murders in which the vehicle is an instrumentality in the murder, and he argues that § 13A-5-40(a)(18) should be construed in accordance with the legislature's intent as expressed in the joint resolution and not the plain language of the statute, which he concedes would place his crime squarely within its

8

effect, because, he says, to do otherwise "makes no sense." (Watts's brief, p. 39.) We disagree.

The Alabama Supreme Court has held that "'[a] resolution is not a law but merely the form in which the legislature expresses an opinion. The Legislature has no power to make laws by resolution.'" Wright v. Childree, 972 So. 2d 771, 780 (Ala. 2006) (quoting Gunter v. Beasley, 414 So. 2d 41, 43 (Ala. 1982)). A statute cannot be amended by a joint resolution of the legislature, see Opinion of the Justices No. 265, 381 So. 2d 183, 185 (Ala. 1980), and "[i]t is a well established principle of statutory interpretation that '[w]here the meaning of the plain language of the statute is clear, it must be construed according to its plain language.'" Crawford v. State, 100 So. 3d 610, 614-15 (Ala. Crim. App. 2011) (quoting Ex parte United Serv. Stations, Inc., 628 So. 2d 501, 504 (Ala. 1993)). Regardless of what the legislature's intent was post-enactment (the joint resolution was passed 14 years after § 13A-5-40(a)(18) was enacted), the plain language of §13A-5-40(a)(18) makes Watts's shooting of Grayson while Watts was inside a motor vehicle a capital crime. Therefore, this argument is meritless.

9

II.

Watts contends that the trial court erred in denying his motion to suppress the statement he made to police.

The record reflects that, after Watts was apprehended, he was taken to the Jefferson County Sheriff's Office, where detectives Shane Williams and Noah Parsons interviewed him and he gave a statement. When Watts and the detectives first entered the room, Det. Williams uncuffed Watts's hands so Watts could sit down. As he was cuffing one of Watts's hands to the chair, Watts protested and Det. Williams said that Watts was there "for a specific reason." In response, Watts said that he thought he was just there to talk, and Det. Williams responded that Watts was there to talk. Det. Parsons then informed Watts that they were investigating a homicide and that Watts was a suspect. Det. Parsons placed a waiver-of-rights form on the table in front of Watts and advised Watts of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Watts indicated that he understood his rights. Det. Parsons then asked Watts: "With those rights in mind, do you wish to make a statement today? Without your attorney present?" In response, Watts mumbled, as best we can discern: "(No or nah), all I did is come down

10

here and ask to talk, I mean, I ... ." At that point, Det. Williams said: "Well, yeah, I mean, if you want to talk, then let's talk, but we're talking about old boy got shot in the head in a car." Det Williams then asked Watts how it happened, and Watts responded, telling the detectives about the alleged fourth person in the vehicle. The interview continued, with Watts answering each of the questions posed by the detectives and oftentimes talking over the detectives in an apparent effort to get his point across and have the detectives believe his version of events. At one point, the detectives left the room as if the interview was over, but Watts called them back in and the interview continued. Watts never signed the waiver-of-rights form.

In his motion to suppress and at the suppression hearing, Watts argued that he did not waive his Miranda rights. His argument was two-fold. First, he argued that his response of "no or nah" when asked if he wanted to make a statement without a lawyer was a clear and unequivocal assertion of his Miranda rights that required the detectives to cease questioning immediately. Second, Watts argued in the alternative that, even if his response of "no or nah" -- because it was followed immediately by Watts's statement that he was there to talk --

11

was an ambiguous or equivocal assertion of his <u>Miranda</u> rights, the detectives were required to clarify his response before questioning him, which they did not do. According to Watts, his response, to the extent it was ambiguous, made it unclear whether he "knowingly and intelligently waived or exercised his Constitutional rights." (C. 200.) The State argued, on the other hand, that Watts's response of "no or nah" should not be construed as an assertion of his <u>Miranda</u> rights because he also stated that he had come to talk and, in fact, did speak to the detectives, and according to the State, Watts waived his <u>Miranda</u> rights and did so voluntarily.

At the suppression hearing, both Det. Parsons and Det. Williams testified that they did not interpret Watts's response of "no or nah" as an indication that Watts did not want to speak with them because Watts stated immediately thereafter that he had come there to talk with them. Det. Parsons testified, however, that he would have clarified Watts's response if Det. Williams had not immediately begun questioning Watts.

In denying Watts's motion to suppress, the trial court considered the totality of the circumstances and determined that Watts had, in fact,

waived his <u>Miranda</u> rights, and it concluded that his waiver and subsequent statement were voluntary.

A.

Watts first reasserts on appeal his argument that he did not waive his <u>Miranda</u> rights. As he did in the trial court, Watts maintains that his response when asked if he wanted to speak to the detectives without an attorney was ambiguous and necessitated a clarification before the detectives questioned him.[2] He also argues that the trial court erred in looking to the totality of the circumstances in determining that he had waived his <u>Miranda</u> rights because, he says, the totality-of-the-circumstances analysis applies only in determining whether a waiver is voluntary, not in determining whether there was a waiver at all. In support of both of these arguments, he relies on <u>E.C. v. State</u>, 623 So. 2d 364 (Ala. Crim. App. 1992).

In <u>E.C.</u>, this Court held that when a suspect, after waiving his <u>Miranda</u> rights, makes an ambiguous or equivocal request for an attorney, all questioning must cease and the police must clarify the

_____

[2]Watts does not pursue on appeal his argument that his response was a clear and unequivocal assertion of his <u>Miranda</u> rights.

13

ambiguous statement, and that any statement taken without such clarification violates <u>Miranda</u>. This Court also held that "'[t]he totality of the circumstances test, which is used to determine whether an accused has "knowingly and voluntarily" waived his <u>Miranda</u> rights, has no role in the determination of whether an accused's request for counsel ... is clear or equivocal.'" 623 So. 2d at 368 (internal citations omitted). <u>E.C.</u>, however, was decided before the United States Supreme Court's decisions in <u>Davis v. United States</u>, 512 U.S. 452 (1994), and <u>Berghuis v. Thompkins</u>, 560 U.S. 370 (2010), and, in light of those decisions, it is no longer good law.

In <u>Davis</u>, supra, the United States Supreme Court held:

"[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect <u>might</u> be invoking the right to counsel, our precedents do not require the cessation of questioning. See <u>ibid</u>. ('[T]he <u>likelihood</u> that a suspect would wish counsel to be present is not the test for applicability of <u>Edwards</u>'); <u>Edwards v. Arizona</u>, supra, 451 U.S. [477,] 485, 101 S.Ct. [1880] 1885 [(1981)] (impermissible for authorities 'to reinterrogate an accused in custody if he has <u>clearly asserted</u> his right to counsel') (emphasis added).

"Rather, the suspect must unambiguously request counsel. As we have observed, 'a statement either is such an assertion of the right to counsel or it is not.' <u>Smith v. Illinois</u>, 469 U.S. [91,] 97-98, 105 S.Ct. [490,] 494 [(1984)] (brackets

14

and internal quotation marks omitted). Although a suspect need not 'speak with the discrimination of an Oxford don,' post, at 2364 (SOUTER, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect."

512 U.S. at 459. In Davis, the Court recognized not only that an ambiguous or equivocal assertion of a Miranda right does not necessitate the cessation of questioning, but that whether the assertion was, in fact, ambiguous or equivocal is to be determined by what a reasonable police officer under the circumstances would understand the assertion to be.

The Davis rule was interpreted by this Court as applying only to an ambiguous assertion of a Miranda right made after the suspect had waived his Miranda rights. See State v. Collins, 937 So. 2d 86, 92-93 (Ala. Crim. App. 2005) (holding that "'Davis was limited to a post-waiver ambiguous invocation of rights,'" and that "'an officer faced with an ambiguous response to an initial advisement of Miranda rights, i.e., at the pre-waiver stage, is limited to posing questions designed to clarify the suspect's ambiguous response'" (citations omitted)), cited with approval in Yeiter v. State, [Ms. CR-18-0599, June 28, 2024] ___ So. 3d ___ (Ala.

15

Crim. App. 2024); Keaton v. State, 375 So. 3d 44 (Ala. Crim. App. 2021); Belcher v. State, 341 So. 3d 237 (Ala. Crim. App. 2020); Steele v. State, 334 So. 3d 558 (Ala. Crim. App. 2020); Lockhart v. State, 163 So. 3d 1088 (Ala. Crim. App. 2013); and Thompson v. State, 97 So. 3d 800 (Ala. Crim. App. 2011). However, in Berghuis, supra, the United States Supreme Court applied the Davis rule to an ambiguous assertion of a Miranda right made before waiver. In addition, the Court in Berghuis considered the totality of the circumstances in determining whether the defendant had waived his right to remain silent, specifically holding that a waiver of Miranda rights "may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.'" 560 U.S. at 384 (quoting North Carolina v. Butler, 441 U.S. 369, 373 (1979) (emphasis added). Berghuis is controlling here.

In Berghuis, Van Chester Thompkins was arrested and questioned by police. Police advised him of his Miranda rights and presented him with a waiver-of-rights form, which he declined to sign. Testimony was conflicting as to whether Thompkins ever indicated that he understood his rights. Police then interrogated Thompkins for three hours, during which time Thompkins was "'[l]argely' silent," although he did answer a

16

few questions with either yes or no. 560 U.S. at 375. Of particular import, toward the end of the interrogation, when asked if he "pray[ed] to God to forgive you for shooting that boy down," Thompkins said "yes." Id. at 376. At no point during the interrogation did Thompkins say that he wanted to remain silent, that he did not want to speak with the police, or that he wanted an attorney.

The United States Supreme Court first rejected Thompkins's argument that his prolonged silence during the interrogation was an invocation of his right to remain silent, holding that an invocation of a Miranda right must be unambiguous. The Court explained:

> "A requirement of an unambiguous invocation of Miranda rights results in an objective inquiry that 'avoid[s] difficulties of proof and ... provide[s] guidance to officers' on how to proceed in the face of ambiguity. Davis, 512 U.S., at 458-459, 114 S.Ct. 2350. If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.' Id., at 461, 114 S.Ct. 2350. Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity. See id., at 459-461, 114 S.Ct. 2350; Moran v. Burbine, 475 U.S. 412, 427, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Treating an ambiguous or equivocal act, omission, or statement as an invocation of Miranda rights 'might add marginally to Miranda's goal of dispelling the compulsion inherent in custodial interrogation.' Burbine, 475 U.S., at 425, 106 S.Ct. 1135. But 'as Miranda holds, full

17

comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process.' Id., at 427, 106 S.Ct. 1135; see Davis, supra, at 460, 114 S.Ct. 2350.

"Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his '"right to cut off questioning."' [Michigan v.] Mosley, [423 U.S. 96,] 103, 96 S.Ct. 321 [(1975)] (quoting Miranda, supra, at 474, 86 S.Ct. 1602). Here he did neither, so he did not invoke his right to remain silent."

560 U.S. at 381-82.

Second, the Court considered whether Thompkins had, in fact, waived his right to remain silent:

"Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [Miranda] rights' when making the statement. [North Carolina v.] Butler, 441 U.S. [369,] 373, 99 S.Ct. 1755 [(1979)]. The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' Burbine, supra, at 421, 106 S.Ct. 1135.

"....

"The prosecution ... does not need to show that a waiver of Miranda rights was express. An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's

18

statement into evidence. <u>Butler</u>, supra, at 376, 99 S.Ct. 1755. <u>Butler</u> made clear that a waiver of <u>Miranda</u> rights may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.' 441 U.S., at 373, 99 S.Ct. 1755. The Court in <u>Butler</u> therefore 'retreated' from the 'language and tenor of the <u>Miranda</u> opinion,' which 'suggested that the Court would require that a waiver ... be "specifically made."' <u>Connecticut v. Barrett</u>, 479 U.S. 523, 531-532, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987) (Brennan, J., concurring in judgment).

"If the State establishes that a <u>Miranda</u> warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate 'a valid waiver' of <u>Miranda</u> rights. <u>Miranda</u>, supra, at 475, 86 S.Ct. 1602. The prosecution must make the additional showing that the accused understood these rights. See <u>Colorado v. Spring</u>, 479 U.S. 564, 573–575, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); <u>Barrett</u>, supra, at 530, 107 S.Ct. 828; <u>Burbine</u>, 475 U.S., at 421-422, 106 S.Ct. 1135. Cf. <u>Tague v. Louisiana</u>, 444 U.S. 469, 469, 471, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980) (<u>per curiam</u>) (no evidence that accused understood his <u>Miranda</u> rights); <u>Carnley v. Cochran</u>, 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962) (government could not show that accused 'understandingly' waived his right to counsel in light of 'silent record'). Where the prosecution shows that a <u>Miranda</u> warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.

"Although <u>Miranda</u> imposes on the police a rule that is both formalistic and practical when it prevents them from interrogating suspects without first providing them with a <u>Miranda</u> warning, see <u>Burbine</u>, 475 U.S., at 427, 106 S.Ct. 1135, it does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights. As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner

inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford. See, e.g., Butler, supra, at 372-376, 99 S.Ct. 1755; [Colorado v.] Connelly, supra, [479 U.S. 157,] 169-170, 107 S.Ct. 515 [(1986)] ('There is obviously no reason to require more in the way of a "voluntariness" inquiry in the Miranda waiver context than in the [due process] confession context'). ...

"The record in this case shows that Thompkins waived his right to remain silent. There is no basis in this case to conclude that he did not understand his rights; and on these facts it follows that he chose not to invoke or rely on those rights when he did speak. First, there is no contention that Thompkins did not understand his rights; and from this it follows that he knew what he gave up when he spoke. See id., at 421, 106 S.Ct. 1135. There was more than enough evidence in the record to conclude that Thompkins understood his Miranda rights. Thompkins received a written copy of the Miranda warnings; Detective Helgert determined that Thompkins could read and understand English; and Thompkins was given time to read the warnings. Thompkins, furthermore, read aloud the fifth warning, which stated that 'you have the right to decide at any time before or during questioning to use your right to remain silent and your right to talk with a lawyer while you are being questioned.' Brief for Petitioner 60 (capitalization omitted). He was thus aware that his right to remain silent would not dissipate after a certain amount of time and that police would have to honor his right to be silent and his right to counsel during the whole course of interrogation. Those rights, the warning made clear, could be asserted at any time. Helgert, moreover, read the warnings aloud.

"Second, Thompkins' answer to Detective Helgert's question about whether Thompkins prayed to God for forgiveness for shooting the victim is a 'course of conduct indicating waiver' of the right to remain silent. Butler, supra, at 373, 99 S.Ct. 1755. If Thompkins wanted to remain silent,

20

he could have said nothing in response to Helgert's questions, or he could have unambiguously invoked his Miranda rights and ended the interrogation. The fact that Thompkins made a statement about three hours after receiving a Miranda warning does not overcome the fact that he engaged in a course of conduct indicating waiver. Police are not required to rewarn suspects from time to time. Thompkins' answer to Helgert's question about praying to God for forgiveness for shooting the victim was sufficient to show a course of conduct indicating waiver. This is confirmed by the fact that before then Thompkins had given sporadic answers to questions throughout the interrogation.

"Third, there is no evidence that Thompkins' statement was coerced. See Burbine, supra, at 421, 106 S.Ct. 1135. Thompkins does not claim that police threatened or injured him during the interrogation or that he was in any way fearful. The interrogation was conducted in a standard-sized room in the middle of the afternoon. It is true that apparently he was in a straight-backed chair for three hours, but there is no authority for the proposition that an interrogation of this length is inherently coercive. Indeed, even where interrogations of greater duration were held to be improper, they were accompanied, as this one was not, by other facts indicating coercion, such as an incapacitated and sedated suspect, sleep and food deprivation, and threats. Cf. Connelly, 479 U.S., at 163-164, n.1, 107 S.Ct. 515. ... In these circumstances, Thompkins knowingly and voluntarily made a statement to police, so he waived his right to remain silent.

560 U.S. at 382-87. The Court then concluded:

"In order for an accused's statement to be admissible at trial, police must have given the accused a Miranda warning. See Miranda, 384 U.S., at 471, 86 S.Ct. 1602. If that condition is established, the court can proceed to consider whether there has been an express or implied waiver of Miranda rights. Id., at 476, 86 S.Ct. 1602. In making its ruling on the

21

admissibility of a statement made during custodial questioning, the trial court, of course, considers whether there is evidence to support the conclusion that, <u>from the whole course of questioning</u>, an express or implied waiver has been established. Thus, after giving a <u>Miranda</u> warning, police may interrogate a suspect who has neither invoked nor waived his or her <u>Miranda</u> rights."

<u>Id.</u> at 388 (emphasis added).

Here, Watts did not state that he did not want to talk to the detectives, that he wanted to remain silent, or that he wanted an attorney. When asked if he wanted to speak with detectives without an attorney, he provided an ambiguous response, stating "no or nah" but then stating that he had come to talk to them. Watts never unambiguously invoked his <u>Miranda</u> rights and, under <u>Davis</u> and <u>Berghuis</u>, the detectives were not required to clarify Watts's ambiguous pre-waiver response before questioning him. Watts also did not sign the waiver-of-rights form or otherwise expressly waive his <u>Miranda</u> rights. However, under <u>Davis</u> and <u>Berghuis</u>, we have no trouble concluding, as the trial court did, that Watts implicitly waived his <u>Miranda</u> rights, and we reach that conclusion, as the trial court correctly did, by considering the totality of the circumstances as instructed by <u>Davis</u> and <u>Berghuis</u>.

First, there is no indication that Watts did not understand his

22

Miranda rights. In fact, after being advised of his rights, Watts told the detectives that he understood them. Second, Watts engaged in a course of conduct during the interview indicating a waiver. He readily answered the detectives' questions, oftentimes talking over the detectives in an apparent effort to get his point across and have the detectives believe his version of the events. When the detectives left the room as if the interview was over, Watts called them back to speak some more. If Watts did not want to speak with the detectives, he would not have so willingly and eagerly answered their questions. Third, there is no evidence indicating that Watts's statement was coerced, and he does not argue otherwise. The interview was conducted in what appears to be a standard-sized room, containing a desk and multiple chairs, and the record indicates that it lasted about an hour. Under these circumstances, the trial court correctly concluded that Watts had implicitly waived his Miranda rights.

## B.

Second, Watts contends on appeal that, even if he did waive his Miranda rights, that waiver was not voluntary because, he says, he was intoxicated and had not slept in two days; he repeatedly stated he was

there to talk, thus indicating that he "believed he was having a conversation and was not giving an official statement"; and he never signed a waiver-of-rights form. (Watts's brief, p. 48.) As the State points out in its brief, Watts did not present these specific arguments to the trial court in his motion to suppress or at the suppression hearing. The focus of Watts's arguments in the trial court was on whether he had waived his Miranda rights at all, not on whether any waiver was voluntary. Therefore, these specific arguments were not properly preserved for review. See, e.g., Newsome v. State, 570 So. 2d 703, 716 (Ala. Crim. App. 1989) ("Review on appeal is limited to review of questions properly and timely raised at trial.").

In any event, after reviewing the record and the recording of Watts's statement to police, we find no evidence indicating that his waiver of rights, albeit implicit, was involuntary. Watts was coherent and animated when answering the detectives' questions, and, although he indicated that he believed the formalities the detectives observed -- handcuffing him to the chair and advising him of his Miranda rights -- were not necessary, it is obvious that his belief was based on his repeated assertions of innocence and not because he did not understand what was

24

happening. In addition, while the record indicates that Watts, Nevel, and Grayson had shared cocaine between 1:30 a.m. and 4:30 a.m., Watts did not give his statement to police until several hours later. Moreover, the fact that Watts did not sign the waiver-of-rights form in no way indicates that his implicit waiver of his rights was not voluntary, especially in light of the fact the detectives began questioning Watts without ever asking him to sign the waiver form. We agree with the trial court that Watts's waiver of his <u>Miranda</u> rights, and his subsequent statement, were voluntary.

Therefore, the trial court properly denied Watts's motion to suppress his statement.

## III.

Watts contends that the trial court erred in not instructing the jury on reckless manslaughter and criminally negligent homicide as lesser-included offenses of the capital-murder charge.

> "'A person accused of the greater offense has a right to have the court charge on lesser included offenses when there is a reasonable theory from the evidence supporting those lesser included offenses.' <u>MacEwan v. State</u>, 701 So. 2d 66, 69 (Ala. Crim. App. 1997). An accused has the right to have the jury charged on '"any material hypothesis which the evidence in his favor tends to establish."' <u>Ex parte Stork</u>, 475 So. 2d 623, 624 (Ala. 1985). '[E]very accused is entitled to have

25

charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however[] weak, insufficient, or doubtful in credibility,' Ex parte Chavers, 361 So. 2d 1106, 1107 (Ala. 1978), 'even if the evidence supporting the charge is offered by the State.' Ex parte Myers, 699 So. 2d 1285, 1290 91 (Ala. 1997), cert. denied, 522 U.S. 1054, 118 S.Ct. 706, 139 L.Ed.2d 648 (1998). However, '[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.' § 13A-1-9(b), Ala. Code 1975. 'The basis of a charge on a lesser included offense must be derived from the evidence presented at trial and cannot be based on speculation or conjecture.' Broadnax v. State, 825 So. 2d 134, 200 (Ala. Crim. App. 2000), aff'd, 825 So. 2d 233 (Ala. 2001), cert. denied, 536 U.S. 964, 122 S.Ct. 2675, 153 L.Ed.2d 847 (2002). '"A court may properly refuse to charge on a lesser included offense only when (1) it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) the requested charge would have a tendency to mislead or confuse the jury."' Williams v. State, 675 So. 2d 537, 540 41 (Ala. Crim. App. 1996), quoting Anderson v. State, 507 So. 2d 580, 582 (Ala. Crim. App. 1987)."

Clark v. State, 896 So. 2d 584, 641 (Ala. Crim. App. 2000) (opinion on return to remand and on application for rehearing).

During the charge conference, Watts requested instructions on reckless manslaughter and criminally negligent homicide[3] as lesser-

---

[3]Watts also requested an instruction on reckless murder, but he does not argue on appeal that the trial court erred in denying that request.

26

included offenses of the capital-murder charge, arguing that there had been no eyewitness testimony as to "the manner" in which the shot that killed Grayson was fired. (R. 609.) Specifically, he argued:

> "In this case, we don't know whether the gun was fired intentionally, recklessly, with extreme indifference, or negligently. The manner in which the firearm was used, there has been no testimony. And so I think that all of those [lesser-included offenses] fit.
>
> "....
>
> "... Nobody testified I saw a man pull the trigger and -- I mean, there was testimony a gun was passed around.[4] And the detective in his interview more or less stated, he may have said it on the stand as well, but there was -- he talked about, you know, he could understand it being an accident. But regardless, the main witness, Mr. Nevel, has always said that he didn't look back. He didn't see the shot. You know that it occurred, but he can't -- no one can say the manner in which the shot occurred."

(R. 610-11.) When the trial court mentioned that there had been evidence indicating that "everyone was doing drugs" and may have been intoxicated, the State argued that there was no evidence indicating that intoxication played a part in the murder and that, even if it did, it was inconsistent with the defense's theory that a fourth man had entered the

---

[4]Watts testified at trial that, when the alleged fourth man entered the vehicle, Watts touched the gun, but there was no testimony that the gun was passed around.

27

vehicle and shot Grayson. (R. 615.) Defense counsel also asserted that "this is not an intoxication-type case. I mean, people were intoxicated. But we're not putting on a defense that that's what" happened. (R. 617.) Defense counsel then reiterated that the basis of his request for instructions on lesser-included offenses was that "[n]obody has testified as to how the gun went off." (R. 618.) The trial court denied Watts's request for instructions on lesser-included offenses.

On appeal, Watts argues that evidence of his cocaine intoxication supported his request for instructions on reckless manslaughter and criminally negligent homicide. Of course, that was not the basis for Watts's request at trial. As noted, the sole basis for Watts's request at trial was that there was no eyewitness testimony as to "the manner" in which the gun was fired. In other words, he argued at trial that the lack of evidence supported giving instructions on lesser-included offenses. He also specifically told the trial court that intoxication was not the defense theory. A party cannot assume inconsistent positions at trial and on appeal. See, e.g., Clark v. State, 896 So. 2d 584 (Ala. Crim. App. 2000). In any event, Watts's was not entitled to jury instructions on reckless

28

manslaughter and criminally negligent homicide based on his alleged cocaine intoxication.

In Ex parte McWhorter, 781 So. 2d 330 (Ala. 2000), the Alabama Supreme Court explained:

> "'"While voluntary intoxication is never a defense to a criminal charge, it may negate the specific intent essential to a malicious killing and reduce it to manslaughter. § 13A-3-2, Code of Alabama (1975) (Commentary). '"When the crime charged involves a specific intent, such as murder, and there is evidence of intoxication, the trial judge should instruct the jury on the lesser included offense of manslaughter." Gray v. State, 482 So. 2d 1318, 1319 (Ala. Cr. App. 1985).' McNeill v. State, 496 So. 2d 108, 109 (Ala. Cr. App. 1986)."
>
> "'[McConnico v. State,] 551 So. 2d [424,] 426 [(Ala. Crim. App. 1988)]. However, to negate the specific intent required for a murder conviction, the degree of the accused's intoxication must amount to insanity.'
>
> "Smith v. State, 756 So. 2d 892, 906 (Ala. Crim. App. 1997) (on return to remand). This Court, likewise, has held that the intoxication necessary to negate specific intent and, thus, reduce the charge, must amount to insanity. Ex parte Bankhead, 585 So. 2d 112, 120-21 (Ala. 1991). See, also, Crosslin v. State, 446 So. 2d 675 (Ala. Crim. App. 1983)."

781 So. 2d at 341. See also Belcher v. State, 341 So. 3d 237 (Ala. Crim. App. 2020); Floyd v. State, 289 So. 2d 337 (Ala. Crim. App. 2017); and Smith v. State, 246 So. 3d 1086 (Ala. Crim. App. 2017).

There was evidence indicating that Watts had ingested cocaine in the hours leading up to the murder and that he was acting "paranoid" and "hopping" around in the backseat after his "first hit" of cocaine, which the record indicates was about three hours before the murder. Yet, there was no evidence as to the quantity of cocaine that Watts ingested during the hours he was with Nevel and Grayson or any other evidence as to what effect the cocaine had on Watts at the time of the murder. In addition, Watts's statement to police and his testimony at trial, in which he recalled in detail the events of the night of the murder, are "wholly inconsistent with being intoxicated to the point of insanity." Smith, 246 So. 3d at 1099. Even viewing the evidence in the light most favorable to Watts, as we must, there was no evidence indicating that Watts was intoxicated to a degree that amounted to insanity. Therefore, the trial court did not err in not instructing the jury on reckless manslaughter and criminally negligent homicide.

IV.

Finally, Watts contends, as he did in his motions for a judgment of acquittal made at the close of the State's case and at the close of all the evidence, that the evidence was insufficient to sustain his capital-murder conviction, because, he says, the State failed to prove that he was the one who shot Grayson or, in the alternative, the State failed to prove that he had the intent to kill.

> "'"In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution."' Ballenger v. State, 720 So. 2d 1033, 1034 (Ala. Crim. App. 1998), quoting Faircloth v. State, 471 So. 2d 485, 488 (Ala. Crim. App. 1984), aff'd, 471 So. 2d 493 (Ala. 1985). '"The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt."' Nunn v. State, 697 So. 2d 497, 498 (Ala. Crim. App. 1997), quoting O'Neal v. State, 602 So. 2d 462, 464 (Ala. Crim. App. 1992). '"When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision."' Farrior v. State, 728 So. 2d 691, 696 (Ala. Crim. App. 1998), quoting Ward v. State, 557 So. 2d 848, 850 (Ala. Crim. App. 1990). 'The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.' Ex parte Bankston, 358 So. 2d 1040, 1042 (Ala. 1978)."

Gavin v. State, 891 So. 2d 907, 974 (Ala. Crim. App. 2003).

"In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039 (5th Cir. 1974); United States v. McGlamory, 441 F.2d 130 (5th Cir. 1971); Clark v. United States, 293 F.2d 445 (5th Cir. 1961).

"'[W]e must keep in mind that the test to be applied is not simply whether in the opinion of the trial judge or the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt; but rather whether the jury might so conclude. Harper v. United States, 405 F.2d 185 (5th Cir. 1969); Roberts v. United States, 416 F.2d 1216 (5th Cir. 1969). The procedure for appellate review of the sufficiency of the evidence has been aptly set out in Odom v. United States, 377 F.2d 853, 855 (5th Cir. 1967):

"'"Our obligation, therefore, is to examine the record to determine whether there is any theory of the evidence from which the jury might have excluded every hypothesis except guilty beyond a reasonable doubt. Rua v. United States, 5 Cir., 1963, 321 F.2d 140; Riggs v. United States, 5 Cir., 1960, 280 F.2d 949. In Judge Thornberry's words,

"'"'... the standard utilized by this Court is not whether in our opinion the evidence and all reasonable inferences therefrom failed to exclude every

32

hypothesis other than guilt, but rather whether there was evidence from which the <u>jury</u> might reasonably so conclude.' <u>Williamson v. United States</u>, 5th Cir., 1966, 365 F.2d 12, 14. (Emphasis supplied)."

"'The sanctity of the jury function demands that this court never substitute its decision for that of the jury. Our obligation is [to] examine the welter of evidence to determine if there exists any reasonable theory from which the jury might have concluded that the defendant was guilty of the crime charged.' <u>McGlamory</u>, 441 F.2d at 135 and 136."

<u>Cumbo v. State</u>, 368 So. 2d 871, 874-75 (Ala. Crim. App. 1978).

Although no one saw Watts shoot Grayson, Nevel testified that there were only three people inside the vehicle and that he saw no one walking in the area when they were at the apartments where the shooting occurred. The bullet that killed Grayson took a slightly back-to-front trajectory and Nevel testified that he saw the flash of the gun in the backseat. Watts was in the backseat, and although he was initially sitting behind Grayson, he was later moving around. After Nevel heard the shot and saw the flash, he looked outside the vehicle, but again saw no one in the area. He then looked in the backseat and saw only Watts, who had "a dumb look on his face" and was saying, "Yeah, yeah." (R.

176.) Nevel then drove to a nearby gas station, at which point Watts fled. A man matching Watts's description later ran from police. When viewed in the light most favorable to the State, there was sufficient evidence from which the jury could have reasonably concluded that the evidence excluded every reasonable hypothesis but that of Watts's guilt. Moreover, the jury could reasonably infer that Watts had the intent to kill from his use of a deadly weapon. See, e.g., Harris v. State, [Ms. CR-2022-0934, February 9, 2024] ___ So. 3d ___, ___ (Ala. Crim. App. 2022) (holding that the defendant's "intent to kill could be inferred from his use of a deadly weapon").

The evidence was sufficient to sustain Watts's capital-murder conviction, and the trial court did not err in denying Watts's motions for a judgment of acquittal.

Based on the foregoing, the judgment of the trial court is affirmed.

AFFIRMED.

Windom, P.J., and McCool, Cole, and Minor, JJ., concur.